154 A.3d 268

**MOUNT AIRY # 1, LLC, Petitioner**

v.

**PENNSYLVANIA DEPARTMENT OF REVENUE AND EILEEN MCNULTY, in Her Official Capacity as Acting Secretary of the Pennsylvania Department of Revenue, Respondents**

No. 34 EM 2015

Supreme Court of Pennsylvania.

ARGUED: March 8, 2016

FILED: September 28, 2016

Michael F. Eichert, Esq., Rigel Caitlin Farr, Esq., Thomas A. Leonard, Esq., Obermayer, Rebmann, Maxwell & Hippel LLP, Michael David Sklar, Esq., Levine, Staller, Sklar, Chan & Brown, P.A., for Mount Airy # 1, LLC, Petitioner.

John Bartley Delone, Esq., Keli Marie Neary, Esq., Gretchen Sprigg Wisehart, Esq., Pennsylvania Office of Attorney General, for Pennsylvania Department of Revenue and Eileen McNulty, in her official capacity as Acting Secretary of the Pennsylvania Dep't. of Revenue, Respondents.

SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

## OPINION

JUSTICE WECHT

Mount Airy # 1, LLC operates a hotel and casino located in Mount Pocono, Pennsylvania. Mount Airy challenges the constitutionality of Section 1403(c) of the Pennsylvania Race Horse Development and Gaming Act ("Gaming Act"). See 4 Pa.C.S. §§ 1101, et seq. That section levies a "local share assessment" against all licensed casinos' gross slot machine revenue. According to Mount Airy, the statutory provision violates the Uniformity Clause of the Pennsylvania Constitution because it imposes grossly unequal local share assessments upon similarly situated slot machine licensees. See PA. CONST. art. VIII, § 1.

Pursuant to Section 1403(b) of the Gaming Act, slot machine licensees are subject to a 34% tax on all Gross Terminal Revenue ("GTR"). The Act defines GTR as the sum of all "cash or cash equivalent wagers received by a slot machine,"

less any amounts paid out to players in various forms. 4 Pa.C.S. § 1103. Slot machine licensees also must pay a local share assessment, which the Commonwealth collects and distributes to the casino's host municipality and/or county. For most casinos, the local share assessment consists of two distinct parts: the county local share assessment and the municipal local share assessment. A casino located outside of Philadelphia County must pay both (a) an annual county local share assessment of 2% of its GTR and (b) a municipal local share assessment of either 2% of its GTR or a lump sum of $10 million, whichever is greater. Therefore, a non-Philadelphia casino with GTR at or below $500 million will always pay a $10 million municipal local share assessment, and a non-Philadelphia casino with GTR above $500 million will always pay more than $10 million. Because, uniquely, Philadelphia County is coterminous with the City of Philadelphia, casinos located there pay only a county local share assessment, which is fixed by the Gaming Act at a rate of 4% of the casino's GTR.

Mount Airy has filed a complaint with this Court challenging the constitutionality of the municipal portion of the local share assessment. Pursuant to Section 1904 of the Gaming Act, we have exclusive jurisdiction over Mount Airy's constitutional claim. 4 Pa.C.S. § 1904 ("The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of [the Gaming Act]."). Specifically, Mount Airy seeks a declaratory judgment that the municipal portion of the local share assessment violates the Uniformity Clause of the Pennsylvania Constitution, both facially and as applied to Mount Airy.[1] Mount Airy avers that the municipal local share assess-

---

1. In addition to its Uniformity Clause challenge, Mount Airy claims that the local share assessment violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In light of our resolution of Mount Airy's Uniformity Clause challenge, the equal protection claim is moot. Mount Airy also brings a claim pursuant to 42 U.S.C. § 1983, arguing that the "continuing assessment and collection" of the local share assessment "constitutes an intentional, knowing, and deliberate violation" of Mount Airy's Equal Protection rights. See Mount Airy's Amended Complaint, 6/17/2015, at 14. Although this Court has exclusive jurisdiction "to hear any challenge to or to render a

ment violates the Uniformity Clause in three ways. First, Mount Airy takes issue with the fact that casinos outside of Philadelphia are subject to a $10 million minimum assessment, whereas similarly situated Philadelphia casinos are not. Second, Mount Airy complains that the General Assembly further subdivided non-Philadelphia casinos into two categories (*i.e.*, those with GTR above $500 million and those with GTR below $500 million) and taxed them differently.[2] Finally, Mount Airy broadly alleges a Uniformity Clause violation based upon the fact that the municipal local share assessment's $10 million floor leads to disparate effective tax rates among casinos.[3] Because we find merit in Mount Airy's second Uniformity Clause argument, we need not address its two alternative arguments.

The Pennsylvania Department of Revenue has filed preliminary objections in the nature of a demurrer to Mount Airy's complaint. According to the Department of Revenue, Mount Airy's Uniformity Clause challenge fails because Mount Airy has not demonstrated that the municipal local share assessment "is not rationally related to any legitimate state purpose." Department of Revenue's Preliminary Objections, 7/17/2015, at 5 (quoting Wilson Partners v. Bd. of Fin. & Revenue, 558 Pa. 462, 737 A.2d 1215, 1220 (1999)). The Department of Revenue argues that the Uniformity Clause is not violated when the General Assembly rationally subdivides Pennsylvania's casinos into separate classes, and then assigns those classes dissimilar tax burdens. Id. at 7.

declaratory judgment concerning the constitutionality of" the Gaming Act, we lack original jurisdiction over Mount Airy's Section 1983 claim. 4 Pa.C.S. § 1904; see generally Penna. State Troopers Ass'n v. Penna. Gaming Control Bd., 591 Pa. 561, 920 A.2d 173 (2007).

2. To illustrate this point, compare two hypothetical casinos located outside of Philadelphia. Casino A's GTR is $100 million and Casino B's GTR is $600 million. Casino A would pay a lump sum $10 million municipal local share assessment, whereas Casino B would pay a $12 million municipal local share assessment (2% of its GTR).

3. Again, compare two hypothetical casinos located outside of Philadelphia. Casino X's GTR is $100 million and Casino Y's GTR is $400 million. Both casinos will pay a $10 million municipal local share assessment, but Casino X's effective tax rate (10%) is substantially higher than Casino Y's effective tax rate (2.5%).

■ Our standard for reviewing preliminary objections in the nature of a demurrer generally is limited to determining whether, based upon the facts averred, the law says with certainty that no recovery is possible. McMahon v. Shea, 547 Pa. 124, 688 A.2d 1179, 1181 (1997). Nonetheless, the General Assembly has assigned this Court broad authority expeditiously to adjudicate constitutional challenges to the Gaming Act. 4 Pa.C.S. § 1904 ("The Supreme Court is authorized to take such action as it deems appropriate ... to find facts or to expedite a final judgment in connection with [a constitutional] challenge or request for declaratory relief."). Because the absence of a developed factual record will not impede our resolution of the purely legal challenges presented here, we may and will decide this case on its merits.

■ The Uniformity Clause of the Pennsylvania Constitution provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art. VIII, § 1. As we have interpreted it, the Uniformity Clause requires that every tax "operate alike on the classes of things or property subject to it." Commonwealth v. Overholt & Co., 331 Pa. 182, 200 A. 849, 853 (1938). "While reasonable and practical classifications in tax legislation are justifiable and often permissible, when a method or formula for computing a tax will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated." Clifton v. Allegheny Cnty., 600 Pa. 662, 969 A.2d 1197, 1211 (2009). Nevertheless, the General Assembly possesses wide discretion in matters of taxation, Aldine Apartments v. Commonwealth, 493 Pa. 480, 426 A.2d 1118, 1121 (1981), and we must resolve any doubts as to the constitutionality of a particular statute in favor of upholding it. Leonard v. Thornburgh, 507 Pa. 317, 489 A.2d 1349, 1352 (1985).

The Uniformity Clause is a product of the Gilded Age, drafted in the late nineteenth century, an era of "robber barons" and rapid economic growth. This Court long has recognized that the Constitution of 1874 sought "to correct the

evil of unwise, improvident and corrupt legislation which had become rampant at the time of its passage." Consumer Party of Penna. v. Commonwealth, 510 Pa. 158, 507 A.2d 323, 333 (1986), *abrogated on other grounds by* Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth, 583 Pa. 275, 877 A.2d 383 (2005); see Perkins v. City of Phila., 156 Pa. 539, 27 A. 356, 360 (1893) ("It is certainly not forgotten that the well-nigh unanimous demand which brought the convention of 1873 into existence was prompted by the evils springing from local and special legislation."). With regard to taxation, "[t]he burden of maintaining the state had been, in repeated instances, lifted from the shoulders of favored classes, and thrown upon the remainder of the community." Fox's Appeal, 112 Pa. 337, 4 A. 149, 153 (1886). The Uniformity Clause sought to eradicate inequitable fiscal policies that had resulted from parliamentary favoritism and class legislation. Id. One commentator offered the following account of the circumstances that precipitated the 1873 constitutional convention:

> The Pennsylvania Constitution of 1874 ... was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations, especially the great railroad corporations. It was the product of a convention whose prevailing mood was one of reform ... and, overshadowing all else, reform of legislation to eliminate the evil practices that had crept into the legislative process. Legislative reform was truly the dominant motif of the convention and that purpose is woven into the very fabric of the constitution.

ROSALIND L. BRANNING, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 37 (1960).

Despite the well-understood text and impetus of the Uniformity Clause, this Court occasionally has struggled to articulate the precise limits that the provision imposes upon the General Assembly's authority to enact tax legislation. Indeed, we have conjectured that "[n]o provision in our constitution has been so much litigated yet so little understood." In re Lower Merion Twp., 427 Pa. 138, 233 A.2d 273, 276 (1967) (likening our

Uniformity Clause jurisprudence to Alice's unpredictable and winding road through Wonderland); see Amidon v. Kane, 444 Pa. 38, 279 A.2d 53, 64 (1971) (Bell, C.J., concurring) ("Some of this Court's decisions on the subject of taxes are confusing, and others irreconcilable."); Note, *The Pennsylvania Constitutional Requirement of Uniformity in Taxation*, 87 U. PA. L. REV. 219, 225 (1938) ("[R]econciliation of the various interpretations of the Pennsylvania uniformity clause would appear futile."). The Department of Revenue's arguments here reflect this confusion.

The Department maintains that Mount Airy's Uniformity Clause challenge must fail because the local share assessment is "rationally related to [a] legitimate state purpose." Brief for the Department of Revenue at 11-12 (citing Wilson Partners, 737 A.2d at 1220). Stated differently, the Department construes the Uniformity Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as coextensive. In the Department's view, a tax that satisfies the latter provision necessarily satisfies the former. By contrast, Mount Airy argues that, under these circumstances, the Pennsylvania Constitution imposes more stringent requirements than the Fourteenth Amendment. Brief for Mount Airy at 30. We agree with Mount Airy.

In the past, this Court has held that the Equal Protection Clause of the Fourteenth Amendment and the Uniformity Clause of the Pennsylvania Constitution are "largely coterminous," Clifton, 969 A.2d at 1212 n.21, and "are to be analyzed in the same manner." Leonard, 489 A.2d at 1351. Nevertheless, we have struck down numerous tax statutes that unquestionably would survive the highly deferential rational basis review attendant to a federal Equal Protection challenge.[4]

4. See, e.g., Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals, 590 Pa. 459, 913 A.2d 194, 201 n.9 (2006) (holding that, unlike the Uniformity Clause, "the United States Constitution does not require equalization across all potential sub-classifications of real property"); Amidon, 279 A.2d at 53 (holding that the Internal Revenue Code's personal exemptions, deductions, and other tax preferences violated the Uniformity Clause); Kelley v. Kalodner, 320 Pa. 180, 181 A.

150

This is so because the two constitutional provisions are only sometimes in alignment. In order to determine the standards associated with a particular Uniformity Clause challenge, we look to our precedent, as well as the text and history of the clause itself. See Hosp. & Healthsystem Ass'n of Penna. v. Commonwealth, 621 Pa. 260, 77 A.3d 587, 606 n.26 (2013) ("In some contexts the Uniformity Clause has been recognized as reflecting more stringent limitations. We do not foreclose the possibility that the Uniformity Clause provides greater protections in other ways as well, based on a developed analysis of its text, history, and meaning." (citation omitted)); Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals, 590 Pa. 459, 913 A.2d 194, 200 (2006) (explaining that "federal equal protection jurisprudence ... sets the floor for Pennsylvania's uniformity assessment").

Here, Mount Airy denies that the General Assembly has the authority to tax casinos differently based upon their geographic location and/or gross revenue. When the validity of a tax classification is challenged, the relevant inquiry is whether the classification is based upon some legitimate distinction between the classes that provides a non-arbitrary, reasonable, and just basis for the disparate treatment. Aldine Apartments, 426 A.2d at 1121–22. We must decide whether there exists "some concrete justification" for treating the relevant group of taxpayers as members of distinguishable classes subject to different tax burdens. Columbia Gas Transmission Corp. v. Commonwealth, 468 Pa. 145, 360 A.2d 592, 595–97 (1976). Absent such a justified distinction between the classes, the imposition of substantially unequal tax burdens upon similarly situated persons violates the Uniformity Clause. Commonwealth v. Staley, 476 Pa. 171, 381 A.2d 1280, 1284 (1978); Amidon, 279 A.2d at 63.

We first address the General Assembly's revenue-based classification of casinos. As explained supra, the Gaming Act provides that non-Philadelphia casinos with GTR below $500 million must pay a lump sum $10 million municipal local share

598, 602 (1935) (holding that a graduated-rate income tax violates the Uniformity Clause).

assessment. Yet, for non-Philadelphia casinos with GTR greater than $500 million, the municipal local share assessment is 2% of the casino's GTR.

In Cope's Estate, 191 Pa. 1, 43 A. 79 (1899), this Court considered a Uniformity Clause challenge to an inheritance tax statute that exempted from taxation the first $5,000 of estate property. With such a generous exemption, approximately 90-95% of Pennsylvania estates paid no inheritance tax whatsoever, while the remaining 5-10% paid a 2% tax. We held that the statute violated the Uniformity Clause because "[a] pretended classification that is based solely on a difference in quantity of precisely the same kind of property is necessarily unjust, arbitrary, and illegal." Id. at 81. We further explained:

> In any view that can reasonably be taken of [the Uniformity Clause], it must be manifest to any reflecting mind that the act in question offends [it] by undertaking to wholly exempt from taxation the personal property of a very large percentage of decedents' estates, and impose increased and unequal burdens on the residue of the same class of property. If the authority to exempt, etc., which was assumed and exercised by the legislature in this case, is sanctioned by this court, the constitutional rule of uniformity virtually becomes a dead letter .... If the legislature had authority, under the constitution, to do what was done in this case, they had like authority to ... impose the tax on personal property amounting in value to $5,000 and less, and exempt therefrom all property of same recognized class in excess of that sum; and, consequently, they have like authority, in every case, to establish any other arbitrary ratio, between the amount in value of property to be taxed and that which shall be exempt therefrom, in any class of subjects.

Id.

■ The basic principle that "[t]he money value of any given kind of property ... can never be made a legal basis of subdivision or classification for the purpose of imposing unequal burdens on [similarly situated] classes," id. at 82, has endured through the years. In Kelley v. Kalodner, 320 Pa. 180, 181 A. 598 (1935), this Court held that a graduated-rate

income tax violated the Uniformity Clause. The statute in that case taxed income below $5,000 at a rate of 2%, income between $5,000 and $10,000 at a rate of 2.5%, and income between $10,000 and $25,000 at a rate of 3%. The Kelley Court explained that the tax was non-uniform because it "result[ed] in taxing those whose incomes arise above a stated figure merely for the reason that in the discretion of the Legislature their incomes are sufficiently great to be taxed." Id. at 602. Relying upon Kelley, we subsequently struck down a city ordinance that taxed "every individual engaged in an occupation ... whose gross earnings would amount to $600 or more during the year." Saulsbury v. Bethlehem Steel Co., 413 Pa. 316, 196 A.2d 664 (1964) (holding that the Uniformity Clause proscribes the unequal treatment of certain individuals based upon their income).

More recently, in Amidon, supra, this Court reviewed Pennsylvania's personal income tax statute, which levied a flat 3.5% nominal tax rate upon all taxable income. Although the tax facially appeared to be uniform, the statute tied the definition of taxable income to each individual's taxable income for federal income tax purposes. 279 A.2d at 55. Thus, the tax incorporated various federal income exceptions, including income derived from gifts, inheritances, employer health plan contributions, and each taxpayer's first $100 of dividends. Id. at 56. The taxable income calculation also permitted deductions for expenditures such as real estate taxes, mortgage interest, alimony payments, and charitable contributions. Id. Citing Kelley and Saulsbury, the Amidon Court held that the General Assembly had imposed upon similarly situated persons differing tax burdens in violation of the Uniformity Clause. Id. at 60 ("[B]uilt-in to the Tax Reform Code of 1971 are exactly the same elements of non-uniformity as were condemned in both Kelley and Saulsbury."). In support of its holding, the Court emphasized that, under the statute, "no two taxpayers are required to pay the same dollar amount of taxes, nor are any two taxpayers required to pay the same effective percentage rate of taxation upon their respective total incomes." Id. at 62.

■ Here, the General Assembly essentially created a variable-rate tax, fashioning one rate for non-Philadelphia casinos with GTR below $500 million, and another for non-Philadelphia casinos with GTR greater than $500 million. Our case law teaches that such quantitative distinctions lack uniformity because any "classification that is based solely on a difference in quantity of precisely the same kind of property is necessarily unjust, arbitrary, and illegal." Cope's Estate, 43 A. at 81. To be sure, the municipal local share assessment's lack of uniformity is less conspicuous than that of the openly unequal graduated-rate tax at issue in Kelley. Instead of taxing some casinos at a rate of 2% and others at a rate of 3%, the General Assembly required that slot machine licensees pay the greater of $10 million or 2% of GTR. Regardless of the language used, however, this is the functional equivalent of a second tax bracket with a marginal rate of 2% for casinos with GTR greater than $500 million.

■ From a concurring and dissenting posture, Chief Justice Saylor correctly notes that the municipal local share assessment is a "floor-but-no-ceiling tax." Concurring and Dissenting Opinion, at 162, 154 A.3d at 282 (Saylor, C.J.). Nonetheless, it is incorrect to say that our case law dealing with other variable-rate assessments has limited relevance with regard to such a tax. This Court has never suggested that the Uniformity Clause hinges upon such formulaic distinctions. Rather, as we explained in Kelley, the Uniformity Clause prohibits the General Assembly from imposing disparate tax rates upon income that exceeds a particular threshold. Kelley, 181 A. at 602; Turco Paint & Varnish Co. v. Kalodner, 320 Pa. 421, 184 A. 37, 40 (1936) ("Where different rates are legislatively imposed on varying amounts or quantities of the same tax base, then you have a graded tax that lacks uniformity under our Constitution."); Cope's Estate, 43 A. at 81 (explaining that the Uniformity Clause guards against any "device that necessarily or intentionally infringes on the established rules of uniformity and relative equality").

Imagine, hypothetically, that the Gaming Act contains two separate municipal assessments: (1) a $10 million lump sum;

and (2) a tax of 2% of GTR, subject to an exemption for the first $500 million of each casino's GTR. The non-uniformity inherent in such a scheme is unmistakable. See Saulsbury, 196 A.2d at 666; Kelley, 181 A. at 602 (holding that the Uniformity Clause prevents the General Assembly from "taxing those whose incomes arise above a stated figure merely for the reason that in the discretion of the Legislature their incomes are sufficiently great to be taxed"); Cope's Estate, 43 A. at 81 ("[T]he act in question offends [the Uniformity Clause] by undertaking to wholly exempt from taxation the personal property of a very large percentage of decedents' estates, and impose increased and unequal burdens on the residue of the same class of property."). It should similarly be obvious that the General Assembly cannot accomplish the same result simply by using the words "or $10,000,000 annually, whichever is greater." The Pennsylvania Constitution prohibits any "method or formula for computing a tax" that will, "in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results." Clifton, 969 A.2d at 1211. Nor may we overlook the patently discriminatory effect of a particular tax merely because the General Assembly employed a formula that, at first blush, does not resemble a traditional variable-rate tax. Id.; Concurring and Dissenting Opinion, at 161, 154 A.3d at 281 (Saylor, C.J.) ("[W]hen assessing the validity of tax legislation, the nomenclature employed by the General Assembly is not necessarily dispositive, as our analysis considers how the tax operates in practice.") (citing Shelly Funeral Home, Inc. v. Warrington Twp., 618 Pa. 469, 57 A.3d 1136, 1141 (2012)).

Nor is it material, much less dispositive, that the local share assessment applies only to commercial entities, whereas the taxes at issue in Kelley, Saulsbury, and Amidon applied exclusively to individuals. See Concurring and Dissenting Opinion, at 162–63, 154 A.3d at 282–83 (Saylor, C.J.). While our Uniformity Clause jurisprudence affords the General Assembly a bit more flexibility in the context of corporate taxation, it does not countenance variable-rate taxes like the one *sub judice*. In this regard, a review of Amidon is instructive. In that case, we struck down a personal income tax that calculated each indi-

vidual's taxable income based upon a myriad of deductions and exemptions, notwithstanding the fact that we previously had upheld a corporate income tax that did the same in Turco Paint & Varnish Co. The Amidon Court distinguished the personal income tax before it from the corporate income tax in Turco, explaining that individuals, who "spend their resources for an infinite variety of reasons unrelated to the making of a profit," cannot be likened to "artificial legal entities created with the permission of the state for the purpose of maximizing profits for shareholders." Amidon, 279 A.2d at 63 (citing Turco Paint & Varnish Co., 184 A. at 40). Plainly, this distinction has no bearing upon the present appeal because Mount Airy challenges only the local share assessment's non-uniform rate. Mount Airy does not take issue with the Gaming Act's formula for determining each casino's taxable base. See 4 Pa.C.S. § 1103 (defining GTR as the sum of all "cash or cash equivalent wagers received by a slot machine," less any amounts paid out to players in various forms).

The Department of Revenue does not attempt to distinguish the key precedents discussed above.[5] Instead, it argues that the General Assembly rationally divided non-Philadelphia slot machine licensees into two categories and taxed them differently in order to provide a "significant source of new revenue to the Commonwealth." Brief for Department of Revenue at 17 (internal quotation marks omitted). This is beside the point. We do not dispute that the Gaming Act was motivated, at least in part, by a desire to increase tax revenue. See 4 Pa.C.S. § 1102 ("The authorization of limited gaming is intended to

5. At oral argument, counsel for the Department of Revenue argued that the municipal local share assessment's status as a "privilege" or "excise" tax distinguishes it from a graduated-rate income tax. We disagree. Although our prior decisions have differentiated between an income tax and "an excise tax for the privilege of doing business in the Commonwealth," none of those cases involved a variable-rate tax analogous to the one *sub judice*. Commonwealth v. Warner Bros. Theatres, 345 Pa. 270, 27 A.2d 62, 63 (1942); see Turco Paint & Varnish Co., 184 A. at 40 ("Where different rates are legislatively imposed on varying amounts or quantities of the same tax base, then you have a graded tax that lacks uniformity under our Constitution."). This Court has never held that a variable-rate tax—whether it be corporate, personal, excise, or income—comports with the Uniformity Clause.

provide a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives."). But the same could be said for virtually every tax that the General Assembly imposes.[6] Were we to hold that the legislature's mere desire to increase tax revenue empowers it to impose non-uniform taxes, we would nullify the Uniformity Clause. We may not do so.

Having concluded that the municipal local share assessment violates the Uniformity Clause, we must decide whether it can be severed from the Gaming Act. The Act contains a severability provision, 4 Pa.C.S. § 1902, and, as a rule, the individual provisions of all statutes presumptively are severable. See 1 Pa.C.S. § 1925. Nevertheless, the General Assembly's declaration that a particular statute is severable serves as a rule of construction only; it is not an inexorable command. Stilp v. Commonwealth, 588 Pa. 539, 905 A.2d 918, 972 (2006). We will decline to sever when, after the void provisions are excised, the remainder of the statute is incapable of execution in accordance with the General Assembly's intent. See id.

Although Section 1403 is remarkably complex, the provision's commands may be grouped into four general categories. First, Subsection 1403(a) establishes a State Gaming Fund within the state treasury. Second, Subsection 1403(b) imposes upon slot machine licensees both a daily tax of 34% of GTR (a

6. Over the years, those that favor the imposition of variable rates have sought to amend our Constitution in order to permit progressivity in Pennsylvania taxation. See Kelley, 181 A. at 603 ("In 1913, and again in 1928, the electorate rejected amendments to the Constitution which would have made legally possible the imposition of taxes with progressive rates."). In 2009, for example, the Pennsylvania Bar Association established a Constitutional Review Commission, which it tasked with examining our charter and recommending improvements. In its report, the Commission recommended that the Uniformity Clause be amended to allow for non-uniform income and property taxes. See Report of the Pennsylvania Bar Association Constitutional Review Commission, at 116 (2011), available at http://www.pabar.org/pdf/crc%20report.pdf. No such amendment to the Pennsylvania Constitution's Uniformity Clause has been passed. Barring such an amendment, Cope's Estate and its progeny remain binding precedent.

levy that Mount Airy does not directly challenge) and a local share assessment. Third, Subsection 1403(c)(2) explains the particulars of the county portion of the local share assessment imposed in Subsection (b). Finally, Subsection 1403(c)(3) describes the finer points of the municipal portion of the local share assessment imposed in Subsection(b).

Subsections (c)(2) and (c)(3), which together are roughly 6,000 words in length, do most of the heavy-lifting in Section 1403. Those subsections set the rate of the local share assessment and restrict each locality's use of the assessment proceeds. Both of these vary depending upon the "category" of the facility [7] and the class of the host county and/or municipality. Although it is easy to get lost in the minutiae,[8] a few key patterns emerge: (1) all Philadelphia casinos (regardless of category) must pay a 4% county local share assessment, 4 Pa.C.S. §§ 1403(c)(2)(i)(A), (c)(2)(ii)(A), and (c)(2)(iii)(A), whereas casinos located elsewhere pay only a 2% county local share assessment; (2) Philadelphia casinos do not pay a municipal local share assessment; (3) all category three casinos outside of Philadelphia must pay a 2% municipal local share assessment, 4 Pa.C.S. §§ 1403(c)(3)(viii)(A)–(C); and (4) category one and two casinos outside of Philadelphia must pay a municipal local share assessment of 2% "or $10,000,000 annually, whichever is greater."

 Because we hold that the municipal portion of the local share assessment set forth in Subsection 1403(c)(3) is unconstitutional, we must sever it from the Act. But the overlap between Subsection 1403(c)(3)'s municipal local share

7. The Gaming Act creates three categories of slot machine licenses. See 4 Pa.C.S. § 1301. A category one license authorizes the placement and operation of slot machines at an existing horse racetrack; a category two license authorizes the placement and operation of slot machines in a stand-alone facility; and a category three license authorizes the placement and operation of slot machines in an established resort hotel with at least 275 guest rooms. 4 Pa.C.S. §§ 1302-1305.

8. See, e.g., 4 Pa.C.S. § 1403(c)(3)(viii)(C) (explaining how the municipal local share assessment's proceeds should be distributed when a "municipality hosting a Category 3 licensed facility is a township of the second class in a county of the fifth class which is contiguous to a county of the seventh class").

assessment and Subsection 1403(c)(2)'s county local share assessment is unmistakable. For example, some cities are subject to an upper limit on the total amount of assessment proceeds they may receive in a given year.[9] Once a city reaches that limit, any additional proceeds are distributed to the host county in accordance with Subsection (c)(2). See 4 Pa.C.S. § 1403(c)(3)(ii) ("Any remaining money shall be collected by the department from each licensed gaming entity and distributed in accordance with paragraph (2) based upon the classification of county where the licensed facility is located."). As this interplay between subsections illustrates, the General Assembly designed a tax scheme that apportions resources from two distinct but overlapping funding sources. Together the two assessments form a comprehensive system of local taxation, which takes into account each gaming facility's GTR and "category." In short, we respectfully disagree that the municipal and county local share assessments are, as Justice Todd categorizes them in her concurring and dissenting opinion, "parallel" but substantially "independent" provisions. See Concurring and Dissenting Opinion, at 168, 154 A.3d at 285 (Todd, J.). Rather, they are two parts of a single tax.

The Gaming Act's legislative scheme, as set forth in the remainder of the statute, establishes the Pennsylvania Gaming Control Board, provides for the issuance of slot machine licenses, authorizes table games, and regulates other miscellaneous aspects of the gaming industry, such as labor hiring preferences and liquor licenses. See 4 Pa.C.S. §§ 1201, 1301-1332, 13A11, 1510, 1521. These provisions may operate even in the absence of the local share assessment. Because we do not believe that the Gaming Act's valid provisions are so dependent upon Subsections 1403(c)(2) and (c)(3) that the General Assembly would not have enacted the former without the latter, we will sever only those two subsections from the Act.

9. See, e.g., 4 Pa.C.S. § 1403(c)(3)(ii) ("The amount allocated to the designated municipalities shall not exceed 50% of their total budget for fiscal year 2003-2004, adjusted for inflation in subsequent years by an amount not to exceed an annual cost-of-living adjustment calculated by applying the percentage change in the Consumer Price Index immediately prior to the date the adjustment is due to take effect.").

See 1 Pa.C.S. § 1925 ("[P]rovisions of every statute shall be severable ... unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one."). In order to maintain continuity, we also must strike the minor references to the local share assessment that appear in Subsections 1403(b) and (c)(1).[10]

At oral argument, the parties advocated for a less thorough-going form of severance, recommending that, if necessary, this Court surgically excise specific portions of Subsection 1403(c)(3) in order to render it constitutional. Mount Airy asks us to strike the $10 million minimum local share assessment, leaving a uniform 4% tax rate for all casinos. The Department of Revenue proposes the opposite. It suggests that we leave the $10 million minimum local share assessment intact, but eliminate any additional taxes for casinos with GTR above $500 million. The parties' requests effectively invite us to make what amounts to a policy decision under the auspices of severance. This Court is not in the business of drafting complex tax statutes, nor are we experts on the financial condition of Pennsylvania's casinos or the financial needs of Pennsylvania's municipalities.

When dealing with a complex tax statute such as this one, which contains many moving parts, this Court's severance decision can amount to a wholesale rewriting of the law. The precise line which divides statutory interpretation from judicial legislation is sometimes difficult to discern, but we must be sure not to traverse it. See Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 320, 321, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ("[M]indful that its constitutional mandate and institutional competence are limited, the Court

10. Subsection (b) provides that "each slot machine licensee shall pay," *inter alia*, "a local share assessment as provided in subsection (c)," and Subsection (c)(1) instructs the Department of Revenue to transfer to the State Gaming Fund the proceeds from "the slot machine tax and assessment imposed in subsection (b)." 4 Pa.C.S. § 1403(c)(1).

restrains itself from 'rewrit[ing] state law to conform it to constitutional requirements.' ") (citing Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)). Under the circumstances presented, we think it most appropriate to leave to the legislative branch the responsibility of fashioning a constitutional local share assessment.

■ We are mindful that our decision may significantly affect many counties and municipalities that have ordered their affairs in reliance upon Section 1403. For this reason, we will stay our decision for 120 days in order to afford the General Assembly an opportunity to evaluate potential remedial measures.

In summary, we hold that the local share assessment is a non-uniform tax of the sort prohibited by Article 8, Section 1 of the Pennsylvania Constitution. Therefore, we must sever Subsections 1403(c)(2) and (c)(3) from the Gaming Act. We award Mount Airy declaratory relief,[11] and we stay our decision for 120 days.

Former Justice Eakin did not participate in the consideration or decision of this case.

11. Mount Airy also seeks monetary damages in connection with the Department of Revenue's violation of the Uniformity Clause. See Mount Airy's Amended Complaint, 6/17/2015, at 12. Pennsylvania law does not provide for a cause of action akin to 42 U.S.C. § 1983, and this Court has never held that monetary damages may be awarded based upon a Uniformity Clause violation. See Balletta v. Spadoni, 47 A.3d 183, 192 (Pa. Cmwlth. 2012) ("To date, neither Pennsylvania statutory authority, nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution."); Kaucher v. Cnty. of Bucks, 2005 WL 283628, at *11 (E.D. Pa. 2005) ("It has been widely held that the Pennsylvania Constitution does not provide a direct right to damages." (collecting cases)). Mount Airy concedes that monetary damages generally do not lie from violations of the Pennsylvania Constitution. Brief for Mount Airy at 35. Nevertheless, it contends that "a claim for [a] refund of payments made under an unconstitutional statute is entirely proper." Id. This is incorrect. As we have explained in the past, "a decision of this Court invalidating a tax statute takes effect as of the date of the decision and is not to be applied retroactively." Oz Gas, Ltd. v. Warren Area Sch. Dist., 595 Pa. 128, 938 A.2d 274, 285 (2007). Thus, Mount Airy is not entitled to an award of damages for its prior municipal local share assessment payments.

Justices Baer, Donohue and Dougherty join the opinion.

Chief Justice Saylor files a concurring and dissenting opinion.

Justice Todd files a concurring and dissenting opinion.

## CONCURRING AND DISSENTING OPINION

### CHIEF JUSTICE SAYLOR

I agree with the majority that relief is presently unavailable under Section 1983 of the Federal Civil Rights Act of 1871. However, I dissent from its conclusion that the Local Share Tax ("LST") on Gross Terminal Revenue ("GTR") is unconstitutional on its face. In my view, factual development is needed to determine its validity.

Initially, and as the majority recognizes, this Court has a duty to uphold legislative enactments if it is reasonably possible to do so. *See* Majority Opinion at 147–48, 154 A.3d at 273; *Triumph Hosiery Mills, Inc. v. Commonwealth*, 469 Pa. 92, 96, 364 A.2d 919, 921 (1976). Also, when assessing the validity of tax legislation, the nomenclature employed by the General Assembly is not necessarily dispositive, as our analysis considers how the tax operates in practice. *See Shelly Funeral Home, Inc. v. Warrington Twp.*, 618 Pa. 469, 477, 57 A.3d 1136, 1141 (2012).

Here, the municipal portion of the LST (the "municipal LST") for non-Philadelphia casinos is stated as "2% of the gross terminal revenue or $10,000,000 annually, whichever is greater." 4 Pa.C.S. § 1403(c). This formulation has the effect of classifying licensees according to whether their GTR is below or above $500 million. *Accord* Brief for Petitioner at 25. Even setting aside the two-percent levy for licensees earning over $500 million, casinos earning less than $500 million pay different effective rates in view of the defined-sum tax of $10 million, a scheme which Petitioners argue "is tantamount to a classification of taxpayers ... based on ... their GTR." *Id.* at 21; *see* Majority Opinion at 146 n.3, 154 A.3d at 272 n.3 (providing a mathematical example to illustrate the point).

Although a difference in effective tax rates as between taxpayers, and the *de facto* classifications which ensue, may warrant close scrutiny, the circumstance does not always render a tax non-uniform, as at least modest defined-sum taxes such as occupation privilege taxes and per capita taxes have been upheld. *See, e.g., Gaugler v. City of Allentown*, 410 Pa. 315, 189 A.2d 264 (1963); *Appeal of Certain Taxpayers of Dunkard Twp.*, 359 Pa. 605, 60 A.2d 39 (1948). The unusual aspect of the present levy is its hybrid nature, since it imposes a floor but no ceiling.[1] A hybrid tax formula such as the present one has never been evaluated for compliance with Pennsylvania's Uniformity Clause; as such, this litigation raises an issue of first impression. Particularly inasmuch as the General Assembly retains "broad authority and wide discretion in matters of taxation," *Clifton v. Allegheny Cnty.*, 600 Pa. 662, 685, 969 A.2d 1197, 1211 (2009) (citation omitted), I believe it incumbent upon this Court to consider whether the circumstances of this case, and its connection to the unique area of gaming, could potentially render a floor-but-no-ceiling tax constitutionally justifiable. In doing so, we should bear in mind the established precept that tax legislation is presumed valid and the person challenging it has the burden of proving otherwise. *See Leventhal v. City of Phila.*, 518 Pa. 233, 239, 542 A.2d 1328, 1331 (1988); *see also Clifton*, 600 Pa. at 686, 969 A.2d at 1211 (recognizing that "a tax enactment will not be invalidated unless it clearly, palpably, and plainly violates the Constitution" (internal quotation marks and citation omitted)).

The majority proceeds by analogy to tax cases primarily involving inheritance or personal income taxes. I view such decisions as having limited relevance in the present context. First, the taxes involved in those disputes were materially different from the tax currently in issue in that they did not subsume the present hybrid-type formulation.[2]

1. Tax statutes imposing a mandatory minimum but no maximum are not unheard of, albeit they often involve smaller mandatory minimums. *See, e.g., City of Portland v. Cook*, 170 Or.App. 245, 12 P.3d 70 (2000) (involving a business license tax of 2.2 percent of adjusted net income, subject to a $100 minimum).

2. The majority also relies in part on *Cope's Estate*, 191 Pa. 1, 43 A. 79 (1899), which held that exempting the first $5,000 of an estate from

Just as important, while most citizens earn income and many hope to provide or receive an inheritance, no individual needs to acquire a gaming license and operate a casino. *Cf. Amidon v. Kane*, 444 Pa. 38, 56, 279 A.2d 53, 63 (1971) (explaining that "[n]atural persons ... cannot be likened to profit-maximizing entities" for purposes of determining whether a statute's method of computing taxable income comports with the Uniformity Clause). Whether or not this latter distinction alone affects the uniformity calculus, it is worth noting that the gaming arena is *sui generis* in that the Commonwealth provides a limited number of licenses and guarantees geographic monopoly status to some licensees and near-monopoly status to others, *see* 4 Pa.C.S. §§ 1304(b), 1307, thus alleviating the effects of free-market forces and ensuring that there is often only one taxpayer per municipality.

Further, casinos by nature attract many customers even when their GTR is less than $500 million. As a result, a single casino is likely to generate significant local effects such as increased vehicular traffic, the presence of a large number of patrons, and the concomitant potential for substantial consumption of municipal resources such as fire and police services. *See Shelly Funeral Home*, 618 Pa. at 476, 57 A.3d at 1140 (observing that "businesses with high gross receipts tend to be larger and more likely than small ones to consume municipal resources"); *cf. Leonard v. Thornburgh*, 507 Pa. 317, 322, 489 A.2d 1349, 1352 (1985) (describing differences in usage of municipal services as a "significant" factor for tax classification purposes).

As well, gaming can have negative social effects such as gambling addiction leading to emotional and behavioral problems—as reflected by the Gaming Act's creation within the

Pennsylvania's inheritance tax worked a uniformity violation. *See id.* at 22, 43 A. at 81; *see also Saulsbury v. Bethlehem Steel Co.*, 413 Pa. 316, 320, 196 A.2d 664, 666 (1964) (holding that an occupational privilege tax levied upon individuals working in the city and earning over $600 annually was non-uniform because persons earning less than that amount were exempted from liability).

The tax statute challenged here is different in that no license holder is exempt from tax liability and no portion of the GTR is exempted from the municipal LST.

Health Department of the Compulsive and Problem Gambling Treatment Fund. *See* 4 Pa.C.S. § 1509; *id.* § 1408 (providing for the transfer of monies into the fund). It seems reasonable to suppose that the hosting municipality is likely to feel these effects most keenly and, moreover, that even a low-GTR casino will impose costs upon such a locality. Therefore, the Legislature may have wished to guarantee a minimum level of indemnification to host municipalities while also ensuring that if a casino exceeded an extremely high threshold, it would pay even more as a consequence of the extra traffic and patronage needed to reach that level of gross revenues.[3]

Finally, and as suggested, the government-imposed monopolistic facet of Pennsylvania's gaming industry means that within the boundaries of the hosting municipality each casino usually has no similarly-situated "neighbor" with whom it can compare tax burdens. *See Del., Lackawanna & W. R. Co.'s Tax Assessment*, 224 Pa. 240, 243, 73 A. 429, 430 (1909) ("While every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor.")

Overall, then, a taxing scheme whereby a slot-machine licensee must pay a percentage of its profits subject to a mandatory minimum does not seem untoward, and I am reluctant to conclude at the present juncture that the non-Philadelphia municipal LST is facially invalid solely on the basis that it imposes different effective tax rates upon different casinos depending on their GTR levels. Notably, in this respect, classifications appearing in tax statutes are permissible so long as they are reasonable and non-arbitrary, *see*

3. Respondents forward an argument along these lines, observing that the Legislature's objectives in enacting the Gaming Act included the provision of a significant source of new revenue for items such as economic development and property and wage tax relief. *See* Brief for Respondents at 17 (quoting 4 Pa.C.S. § 1102(3)). Respondents continue that the $10 million minimum "ensures the Commonwealth can rely upon receiving, at a minimum, this revenue to fund its specified goals" and "guarantees revenue to fund the expenses that municipalities face in developing and maintaining their infrastructure when licensed entities are operated in their communities." *Id.* at 17–18.

*Leonard,* 507 Pa. at 321, 489 A.2d at 1352, and the government has not yet had a chance to demonstrate reasonableness via evidentiary development.

In view of the foregoing, and recognizing that this litigation has not progressed beyond the pleading stage—meaning there is no evidentiary record—I would overrule Respondents' preliminary objections and appoint a special master to hear evidence and make findings, in the first instance, on whether there is a rational basis for the classifications inherent in the municipal LST. *See* 4 Pa.C.S. § 1904 (authorizing this Court to "take such action as it deems appropriate . . . to find facts").[4] I therefore respectfully dissent from the majority's holding that the municipal LST for non-Philadelphia casinos is facially unconstitutional.

I am also not convinced that the difference in levies imposed on Philadelphia and non-Philadelphia casinos is impermissible. Philadelphia is qualitatively different from other municipalities in multiple respects. First, and as the majority observes, it is unique in that the city and county are coterminous. *See* Majority Opinion at 145, 154 A.3d at 271. Thus, the Legislature could reasonably have believed it was unnecessary to guarantee a mandatory minimum solely to the municipality as long as the county and municipal LST components were combined into a single, four-percent levy. Second, Philadelphia is the only municipality that the Gaming Act allows to host multiple Category 2 licensees, *see* 4 Pa.C.S. §§ 1304(b)(1), 1307, with the consequence that Philadelphia licensees must contend with greater competition in their immediate geographic area—a reasonable basis (in my view) for distinct tax treatment. Third, and as Respondents argue, Philadelphia

---

4. Although the challenger bears the initial burden to prove invalidity, once differential treatment has been shown the burden shifts to the taxing authority to demonstrate that the tax is nonetheless uniform. *Accord Geja's Cafe v. Metro. Pier & Exposition Auth.,* 153 Ill.2d 239, 180 Ill.Dec. 135, 606 N.E.2d 1212, 1216 (1992) (explaining that, upon a good-faith uniformity challenge, the taxing authority must justify its classifications, whereupon the burden shifts to the plaintiff to demonstrate that the explanation is insufficient or unsupported by the facts). *See generally 500 James Hance Court v. Pa. Prevailing Wage Appeals Bd.,* 613 Pa. 238, 272–73, 33 A.3d 555, 575–76 (2011).

casinos are subject to other substantial business taxes. Accordingly, if it can be shown that the classification was designed to roughly equalize the tax burden imposed on Philadelphia and non-Philadelphia licensees, such a showing would, in my view, demonstrate a legitimate basis for the challenged classification.

Again, however, there is no factual record before this Court, and hence, we have no comparative data concerning how taxes extrinsic to the Gaming Act levied on Philadelphia gaming facilities compare to those imposed on non-Philadelphia casinos. That being the case, I would require a special master to make findings in the first instance predicated upon evidentiary development on the subject—with Respondents, again, ultimately bearing the burden of proof. *See supra* note 4.

## CONCURRING AND DISSENTING OPINION

### JUSTICE TODD

In my view, Section 1403(c)(3) of the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. § 1101-1904 (the "Gaming Act"), violates the Uniformity Clause of the Pennsylvania Constitution. Accordingly, I join the majority's reasoning and conclusion that Section 1403(c)(3)—because it creates a variable-rate tax, with one rate for non-Philadelphia casinos with gross terminal revenue ("GTR") below $500 million, and another for non-Philadelphia casinos with GTR greater than $500 million—is constitutionally infirm. See Majority Opinion at 147–54, 157 A.3d at 272–77.

With respect to the issue of severability, however, I respectfully dissent. In my view, the majority has engaged in an unnecessarily limited severing of the Gaming Act—that is, they have unnecessarily stricken provisions of the legislation—and, as a result, have placed numerous counties and municipalities in a state of financial uncertainty. Application of both the General Assembly's general and specific standards regarding severance leads me to conclude that the violation of the Uniformity Clause manifest in this matter requires the striking of only subsection (c)(3) of Section 1403, thus preserving the remainder of that section. My reasoning follows.

Severance permits a court, which finds a provision of legislation to be constitutionally infirm, to nevertheless maintain the integrity and functionality of some or all of the remaining provisions of the legislation. In Pennsylvania, the legislature, through the canons of statutory construction, has given guidance to the courts as to how it desires severability to operate. The General Assembly has created a presumption of severability, and directed courts to uphold the remainder of an infirm statute "unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision ... that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." 1 Pa.C.S. § 1925.

Even more definitively, the General Assembly has set forth an express, and arguably more exacting, severance guideline for courts to follow when considering the invalidity of provisions of the Gaming Act. Indeed, except for certain core statutory provisions, the legislature has dictated that all provisions of the Gaming Act "are severable," and that an infirm provision "shall not affect other provisions or applications of this part which can be given effect without the invalid provision or application." 4 Pa.C.S. § 1902(a). Thus, in general, and most emphatically with respect to the Gaming Act, the legislature has expressed its intent that the judiciary is to give maximum effect to non-infirm provisions, and act with a scalpel, rather than with an ax.

Applying these standards to the Uniformity Clause challenge before us, while I agree that subsection (c)(3) of Section 1403 is constitutionally infirm, in my view, all of Section 1403's remaining provisions are capable of severance and, thus, being given effect. Initially, as noted by the majority, only the constitutionality of subsection (c)(3), concerning local share assessments of municipalities, is at issue in this matter. Its sister provision, subsection (c)(2), concerning county assessments, is not challenged. In my view, this unchallenged county

assessment provision can be severed from the infirm provision concerning municipalities, and be given independent effect.

Specifically, while both provisions fall under the umbrella of transfers and disbursements of local share assessments, subsection (c)(2) stands as a parallel, and save one subclause, independent provision from subsection (c)(3). Indeed, these provisions are characterized by their specific and distinctive language. Significantly, there is only a single cross-reference to subsection (c)(3) found in (c)(2), and that connection, while outwardly giving a certain degree of credence to the idea of interrelatedness, would merely be rendered inoperative by the striking of subsection (c)(3). See 4 Pa.C.S. § 1403(c)(2)(iii)(F)(III) (for Category 2 licensees, providing for distribution to counties of the fifth class of any revenue required to be transferred under paragraph (c)(3)(v)).[1, 2] Subsection (c)(2) is but one portion of the local share assessment, and may be uncoupled from the municipal portion of that assessment in subsection (c)(3) stricken today. Thus, applying the applicable severance standards, subsection (c)(2) can be given effect without the invalid subsection (c)(3) and is not

[1]. Related to this single provision, subsection (c)(2)(viii) provides that "[i]f any provision of this paragraph [i.e., subsection (c)(2)] is found to be unenforceable for any reason, the distribution provided for in the unenforceable provision shall be made to the county in which the licensed facility is located for the purposes of grants to municipalities in that county, including municipal grants as specified in subparagraph(v)." As styled, this savings clause is not triggered by the striking of (c)(3), as subsection (c)(2)(iii)(F)(III), noted above, would merely be rendered inoperative, as a practical matter, by the striking of (c)(3), and not made unenforceable. Similarly, the corresponding savings clause for subsection (c)(3)—subsection (c)(3)(xiii)—while implicated, would not, as styled, save any provisions due to the taxing scheme rendering infirm the entirety of subsection (c)(3).

[2]. While subsection (c)(2) only contains a single cross-reference to subsection (c)(3), subsection (c)(3) contains numerous references regarding the distribution of remaining funds pursuant to subsection (c)(2). See, e.g., 4 Pa.C.S. § 1403(c)(3)(ii), (iii), (iv), (v), (vi), (vii), (viii). While this understandably supports the majority's conclusion that (c)(2) and (c)(3) are so interrelated that they both must be stricken, given the severance standards, and in particular the more demanding severance requirements set forth in the Gaming Act, we are tasked to analyze the severance question with exacting scrutiny. Thus, I find subsection (c)(2) is not so intertwined with (c)(3) that it cannot be severed.

essentially and inseparably connected with that infirm subsection. While the Gaming Act's funding and taxing provisions at issue are no doubt complex, it cannot be presumed the General Assembly would not have enacted subsection (c)(2) without subsection (c)(3). Thus, contrary to the majority and concurrence, I find subsection (c)(2) to be severable.

Further, in preserving subsection (c)(2), I find that the other related provisions of Section 1403 are likewise severable. Specifically, subsection (a) merely establishes the State Gaming Fund; it is wholly unaffected by subsection (c)(3), and assuredly would have been enacted without subsection (c)(3). Similarly, subsection (b) sets a daily tax of 34% from daily GTR and a local share assessment as provided in subsection (c). While "local share assessment" is not defined, as indicated above, it includes assessments from licensees for distribution to *both* counties and municipalities. Further, subsection (b) speaks of funds that are owed to the Commonwealth, a county, or a municipality, being held in trust by the licensed gaming entity. Thus, the mere striking of subsection (c)(3) regarding the municipal portion of the local share assessment does not render nugatory the local share assessment for counties, or the holding of any funds in trust; it merely renders the subsection inoperative with respect to hosting municipalities. Again, subsection (b) can be given effect without subsection (c)(3) and it cannot be presumed that the General Assembly would not have enacted subsection (b) without subsection (c)(3). In addition, subsection (c)(1) merely provides for the transfer of slot machine tax and local share assessments imposed by subsection (b) to the State Gaming Fund. There is no basis to conclude this transfer cannot operate without the municipal portion of the local share assessment.

The remaining subsections are likewise severable. Subsection (d), which defines the Consumer Price Index, is wholly operative without subsection (c)(3), as it is utilized in subsection (c)(2) for defining distributions among the counties. Similarly, subsection (e) speaks to reporting requirements and information-providing obligations regarding distributions of local share assessments, which applies to counties and munici-

palities; thus, this subsection remains operative, albeit there would be nothing to report with respect to municipalities governed by subsection (c)(3). Subsection (f) prohibits certain compensable lobbying activities. It can remain wholly operative without (c)(3). Even though it recognizes an exception for certain qualified persons preparing grant applications for funds for counties and municipalities, that exception is meaningful because funding flows to both counties and municipalities in (c)(2).

Finally, as an aside, by engaging in broad severance, and keeping operative as many provisions of the Gaming Act as possible as envisioned by the General Assembly, our Court would be acting consistent with the public policy goals of that Act, which include providing a significant source of revenue to the Commonwealth, 4 Pa.C.S. § 1102(3), providing broad economic opportunities to the citizens of the Commonwealth, 4 Pa.C.S. § 1102(5), and considering the public interest of the citizens of the Commonwealth in any decision or order with respect to the Gaming Act. 4 Pa.C.S. § 1102(10); cf. Pennsylvanians Against Gambling Expansion Fund, Inc. v. Com., 583 Pa. 275, 877 A.2d 383, 403 n.14 (2005) (acknowledging, as a separate matter, significant policy justifications against severance on a finding of a violation of the single-subject provision in circumstances where logrolling may have occurred). Indeed, the majority's striking of Section 1403(c)(2) (in addition to its proper striking of subsection (c)(3)) will, in my view, unnecessarily throw numerous counties and municipalities, already facing difficult budgetary constraints, as well as the Commonwealth itself, into a state of further financial uncertainty.

Thus, for the above reasons, I join the Majority Opinion in part, and respectfully dissent in part.