**[J-25-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| NATIONAL HOCKEY LEAGUE PLAYERS ASSOCIATION, MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, JEFFERY B. FRANCOEUR, KYLE C. PALMIERI, AND SCOTT WILSON, <br><br> Appellees <br><br> v. <br><br> CITY OF PITTSBURGH, <br><br> Appellant | : No. 20 WAP 2024 <br> : <br> : Appeal from the Order of the <br> : Commonwealth Court entered <br> : January 10, 2024, at No. 1150 CD <br> : 2022, Affirming the Order of the <br> : Court of Common Pleas of <br> : Allegheny County entered <br> : September 21, 2022, at No. GD-19- <br> : 015542. <br> : <br> : ARGUED:  April 10, 2025 <br> : <br> : <br> : <br> : <br> : <br> : |

**OPINION**

**JUSTICE WECHT**                    **DECIDED: SEPTEMBER 25, 2025**

Since 2005, the City of Pittsburgh has collected a three percent tax on income that non-Pittsburgh residents earn while performing at one of the City's publicly funded sports stadiums.  The courts below held that this so-called "jock tax" unconstitutionally discriminates against nonresidents in violation of the Uniformity Clause of the Pennsylvania Constitution.[1]  We agree.

---

[1]    PA. CONST. art. VIII, § 1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax.").

Under the Local Tax Enabling Act ("LTEA"), a second-class city with a publicly funded sports stadium or arena "may enact a publicly funded facility usage fee upon those nonresident individuals who use such facility to engage in an athletic event or otherwise render a performance for which they receive remuneration."[2]  Under this enabling statue, a second-class city can set the facility fee at a defined, flat-dollar amount, or it can tax a percentage (up to three percent) of the income earned at the publicly funded stadium.[3]

By ordinance, and as authorized by the LTEA, the City of Pittsburgh enacted a Nonresident Sports Facility Usage Fee (the "facility fee") of three percent on all income earned while performing at any of Pittsburgh's three publicly funded sports venues.[4]  One might assume that the facility fee exists to offset public funds that the City spent to construct the stadiums, but that is not the case.  The General Assembly amended the LTEA to allow for the imposition of a facility fee in the early 2000s because the City of Pittsburgh was experiencing severe financial distress and needed to raise additional

---

[2]     53 P.S. § 6924.304.  Pittsburgh is Pennsylvania's only second-class city.  *See* 11 Pa.C.S. § 201 (defining "cities of the second class" to mean those with "a population of at least 250,000 inhabitants but less than 1,000,000 inhabitants").

[3]     *Id.*

[4]     PITTSBURGH CODE OF ORDINANCES § 271.02.  The three venues in question are PNC Park, Acrisure Stadium, and the PPG Paints Arena, which host events for Major League Baseball ("MLB"), the National Football League ("NFL"), and the National Hockey League ("NHL"), as well as concerts and other performances.

revenue.[5]  And while the three venues in question were built, at least partially, using public funds, none of those funds came from the City.[6]

The City's ordinance imposing the facility fee states that the fee applies to "each nonresident who uses a publicly funded facility to engage in an athletic event or otherwise render a performance for which [] such nonresident receives remuneration."[7]  The City's ordinance and the LTEA both provide that nonresident performers who are subject to the facility fee shall be exempt from the City's generally applicable one-percent earned income tax.[8]  The LTEA also stipulates that, in the event that the enabling legislation is ruled unconstitutional, nonresidents will no longer be exempt from the City's earned income tax.[9]  Meanwhile, Pittsburgh residents are not subject to the facility fee.  Instead,

---

[5]  As Appellees explain in their brief, the City in 2003 was granted distressed municipality status under the Municipalities Financial Recovery Act.  Among other things, that designation permitted the City (with court approval) to temporarily increase its earned income tax rate above what is ordinarily allowed by law.  Such an imposition, however, was politically unpopular.  In order to avoid increasing taxes on all Pittsburgh workers, the General Assembly amended the LTEA to allow the City instead to impose an entirely new tax:  a "facility fee" of up to three percent on nonresident performers and entertainers.  *See* Brief for Appellees at 4-10 (detailing the origins and legislative history of the facility fee).

[6]  *See Regional Destination Financing Plan*, SPORTS & EXHIB. AUTH., https://www.pgh-sea.com/index.php?path=about-sea-plan ("No City or County funds were used to pay for these projects.").

[7]  PITTSBURGH CODE OF ORDINANCES § 271.02.

[8]  *Id.* § 271.06; 53 P.S. § 6924.304.

[9]  53 P.S. § 6924.304 ("Should a court of competent jurisdiction determine this provision to be invalid for any reason, persons subject to the publicly funded facility usage fee shall not be exempt from any previously applicable earned income tax.").

they are subject to the City's one percent earned income tax, plus a two-percent school district tax.[10]

The plaintiffs in this case (collectively, "the Athletes") consist of: (1) active and retired professional athletes who, as nonresidents of Pittsburgh, were subject to the City's facility fee while working at one of Pittsburgh's publicly funded stadiums; and (2) unions that represent the interests of professional athletes in the NHL, MLB, and NFL.[11] In November 2019, the Athletes filed an action for declaratory and injunctive relief against the City of Pittsburgh, challenging the facility fee under various provisions of the United States and Pennsylvania Constitutions. Relevant to this appeal, the Athletes argued that the facility fee violates the Uniformity Clause of the Pennsylvania Constitution because it treats nonresident athletes and performers (who pay the 3% facility fee) less favorably than similarly situated *resident* athletes and performers (who pay only a 1% earned income tax). The City, on the other hand, argued that both resident and nonresident performers pay the same total effective tax rate of three percent, since residents are additionally subject to a two percent school-district tax that does not apply to nonresidents.

The parties filed cross motions for summary judgement on a set of stipulated facts. The trial court granted the Athletes' motion for summary judgment, holding that the facility fee violates the Uniformity Clause. The trial court rejected the City's argument that the

---

[10] Trial Court Opinion, 9/21/2021, at 7. Nonresidents are not subject to the two-percent school district tax. The Public School Code of 1949 prohibits the imposition of school taxes on nonresidents of a school district. 24 P.S. § 6-652.1(a)(4).

[11] Pittsburgh's facility fee is sometimes informally called a "jock tax," *see*, *e.g*., Paul Williams, *Pa. Judge Strikes Down Pittsburgh's Nonresident 'Jock Tax,'* LAW360 (Sept. 22, 2022), https://www.law360.com/articles/1533067, but that moniker actually understates the scope of the tax. While the plaintiffs before us happen to be professional athletes and their representatives, the facility fee also applies to other types of nonresident entertainers who "render a performance" at one of the City's three publicly funded stadiums.

total tax burden on residents and nonresidents is equal because the Pittsburgh School District tax (which nonresidents do not pay) must be taken into account. The court stated that the City "cannot find uniformity where a separate entity taxes residents for a separate purpose."[12] In other words, the trial court considered the relevant question to be whether the City's nonresident facility fee is uniform with the City's (resident) earned income tax, which, as noted, it is not: "while Pittsburgh athletes pay a 1% tax on their income to the City, other Pennsylvania athletes pay a 3% tax on their income due to the Facility Fee."[13] Finding "no permissible or rational basis for an unequal application of tax rates across residents and nonresidents," the trial court concluded that the facility fee violates the Uniformity Clause.[14]

The Commonwealth Court, sitting *en banc*, agreed with the trial court that the facility fee violates the Uniformity Clause.[15] Like the trial court, the panel believed that the two percent school district tax paid by Pittsburgh residents is "not relevant to [the] analysis" because state law prohibits the Pittsburgh School District from imposing school

---

[12]     Trial Court Opinion, 9/21/2021, at 7-8 (*Danyluk v. Bethlehem Steel Co.*, 178 A.2d 609 (Pa. 1962)).

[13]     *Id.* at 8.

[14]     *Id.* The City urged the trial court to save the facility fee by severing the word "nonresident" from the ordinance, thus making the three percent facility fee applicable to residents and nonresidents alike. The trial court declined this invitation, noting that the LTEA allows the City to impose the facility fee only on "nonresident individuals." *See* 53 P.S. § 6924.304 (authorizing the City of Pittsburgh to impose a facility fee on "*nonresident* individuals who use such facility to engage in an athletic event or otherwise render a performance for which they receive remuneration" (emphasis added)).

[15]     *Nat'l Hockey League Players Ass'n v. City of Pittsburgh*, 308 A.3d 318 (Pa. Cmwlth. 2024), *appeal granted in part*, 322 A.3d 1285 (Pa. 2024).

taxes on nonresidents in the first place.[16] Excluding the school district tax from the analysis, the panel stated that the City "effectively imposed a 3% [earned income tax ("EIT")] on nonresidents who derive income from the City's Facilities, while imposing a 1% EIT on residents who similarly derive income from the Facilities."[17] Because the City "failed to provide the requisite concrete justification for treating residents and nonresidents as distinguishable classes that may be subjected to different tax burdens," the panel affirmed the trial court's decision finding the facility fee to be unconstitutional.[18]

President Judge Renee Cohn Jubelirer authored a dissenting opinion in which she opined that the facility fee does not violate the Uniformity Clause because, "in substance, the City has treated residents and nonresidents alike with respect to their respective tax burdens."[19] Judge Cohn Jubelirer explained that the Uniformity Clause "is primarily concerned about equality of tax burden among members of a class."[20] Here, Judge Cohn Jubelirer explained, the facility fee equalizes the tax burden so that both residents and nonresidents pay three percent on their income attributable to the stadiums. For nonresidents, the entire three percent goes to the general fund whereas, for residents, one percent goes to the general fund and two percent goes to the school district. In Judge Cohn Jubelirer's view, however, the "ultimate destination" of tax revenue does not matter

---

[16]    *Id.* at 325 ("The 2% school tax paid by residents is not relevant to our analysis, as the [Pittsburgh School] District is prohibited from imposing school taxes on nonresidents, per Section 652.1(a)(4) of the School Code.").

[17]    *Id.*

[18]    *Id.* ("Rough uniformity is not achieved where only one class of taxpayers–nonresidents–is assessed a 2% tax on income derived from its use of the Facilities.").

[19]    *Id.* at 327 (Cohn Jubelirer, P.J., dissenting).

[20]    *Id.* at 328 (Cohn Jubelirer, P.J., dissenting).

under the Uniformity Clause so long as the "overall burden" on resident and nonresident the taxpayers remains the same.[21]

The City of Pittsburgh filed a petition for allowance of appeal, which we granted to consider whether the facility fee violates the Uniformity Clause.[22] As we have explained in the past, the Uniformity Clause of the Pennsylvania Constitution requires that every tax "operate alike on the classes of things or property subject to it."[23] "While reasonable and practical classifications in tax legislation are justifiable and often permissible, when a method or formula for computing a tax will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated."[24]

The General Assembly nevertheless possesses wide discretion in matters of taxation, and we must resolve any doubts as to the constitutionality of a particular tax in favor of upholding it.[25] We have stressed that the uniformity clause does not mandate absolute equality or perfect uniformity in taxation.[26] Rather, when faced with a challenge to the validity of a tax classification, we ask whether the classification is based upon some legitimate distinction between the classes such that it provides a non-arbitrary, "reasonable and just" basis for the disparate treatment.[27] In other words, we must determine whether there exists "some concrete justification" for treating the relevant

---

[21] *Id.* (Cohn Jubelirer, P.J., dissenting).

[22] Although we granted review of the Uniformity Clause issue, we declined to take up the issue of whether the lower courts erred in striking the entire ordinance rather than selectively severing it.

[23] *Commonwealth v. Overholt & Co.*, 200 A. 849, 853 (Pa. 1938).

[24] *Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1211 (Pa. 2009).

[25] *Aldine Apartments v. Commonwealth*, 426 A.2d 1118, 1121 (Pa. 1981); *Leonard v. Thornburgh*, 489 A.2d 1349, 1352 (Pa. 1985).

[26] *Columbia Gas Corp. v. Commonwealth*, 360 A.2d 592, 595 (Pa. 1976).

[27] *Aldine Apartments*, 426 A.2d at 1121-22.

taxpayers as members of distinguishable classes.[28]  Absent such a legitimate distinction, the imposition of unequal tax burdens upon similarly situated taxpayers is unconstitutional.[29]

Here, the City does not provide concrete reasons that would justify taxing nonresident athletes and entertainers more than resident athletes and entertainers. Instead, the City once again argues that the facility fee "does not impose an unequal tax burden on nonresidents" because it actually *equalizes* the tax burdens of resident and nonresident performers.[30]  Residents who perform at the stadiums are taxed three percent of what they earn (one percent to the City and two percent to the School District), and now—because of the facility fee—nonresidents also pay a three percent tax.  The City maintains that a tax which equalizes the burdens between two groups of taxpayers cannot violate the Uniformity Clause.[31]

Relevant to the City's argument is *Minich v. City of Sharon*,[32] which the City believes controls the outcome of this case.  *Minich* concerned an earned income tax of ten mills that the City of Sharon imposed on both residents and nonresidents.  In addition to Sharon's earned income tax, Sharon residents also had to pay an income tax of five mills to the Sharon School District.  Because state law at the time required that political subdivisions credit their residents for "any other like tax" imposed by a separate taxing

---

[28]    *Columbia Gas Corp.*, 360 A.2d at 595-97.

[29]    *Amidon v. Kane*, 279 A.2d 53, 63 (Pa. 1971).

[30]    Brief for City of Pittsburgh at 22.

[31]    *Id.* at 23 ("Because there is no 'substantially unequal tax burden' among the taxpayers subject to the Facility Fee—regardless of any purported classifications—the tax does not violate the Uniformity Clause." (quoting *Mount Airy #1, LLC v. Pa. Dep't of Revenue*, 154 A.3d 268, 274 (Pa. 2016)).

[32]    77 A.2d 347 (Pa. 1951).

authority, Sharon residents who paid Sharon School District taxes were able to reduce their ten mill City income tax burden to five mills.

Nonresident taxpayers of the City of Sharon challenged this taxing scheme under the Uniformity Clause, arguing that, because their own communities did not impose an income tax—either at the city or school district level—they were unable to claim a credit on their Sharon earned income tax. The taxpayers claimed that this state of affairs violated the Uniformity Clause because taxpayers were being treated differently depending upon where they lived, since the City of Sharon collected the full ten mills from nonresidents while collecting only five mills from Sharon residents.

We rejected the challengers' argument, noting that the Sharon tax scheme's system of credits was neutral, as is required by the Uniformity Clause, because both Sharon residents and nonresidents were entitled to a credit for taxes paid on the same wages to a different political subdivision.[33] The challengers received no credit because their communities lacked an income tax, not because the Sharon scheme discriminated against nonresidents.

The City claims that *Minich* controls this case. According to the City, *Minich* applied a "functional," "rough uniformity" standard to uphold "an income tax scheme that was closely analogous to Pittsburgh's facility fee."[34] In the City's telling, *Minich* embraced a relaxed Uniformity Clause analysis that focuses on "the equality of the overall tax burden

---

[33]     *Id.* at 350 ("If the residents of the School District of the City of Sharon were, instead, residents of the Borough of Mercer, Greenville or Grove City, as these plaintiffs are, and they were there taxed 5 mills on the wages earned by them in the City of Sharon, they would be entitled to the same allowance in that amount as that now credited them by reason of the tax imposed upon them by the School District of the City of Sharon. There is therefore no such classification between residents and non-residents of the City of Sharon as plaintiffs envisage.").

[34]     Brief for the City of Pittsburgh at 16.

on similarly situated taxpayers."[35]  According to the City, this means that, "as long as similarly situated taxpayers bear the same 'entire burden,' the Uniformity Clause is satisfied."[36]  The City stresses that, "under this functional analysis, it did not matter [in *Minich*] that multiple taxing entities were involved."[37]

The City's interpretation of *Minich* is unpersuasive.  We upheld the challenged tax scheme in *Minich* because we concluded that it did not treat residents and nonresidents differently.[38]  The challengers in *Minich* lived in school districts that did not impose income taxes, and their objection was that people who lived in the Sharon School District (and therefore paid Sharon School District taxes) could get a credit on their Sharon city taxes. The Uniformity Clause challenge in *Minich* failed because:  (1) the Sharon tax scheme did not actually discriminate based upon residency; and (2) "[a]llowing a credit against the payment of a tax for taxes paid to some other governmental authority is not a violation of the constitutional requirement of uniformity."[39]  The challengers in *Minich*, in other words, took issue with how the City of Sharon's uniform tax scheme interacted with the uniform tax schemes of the challengers' own local taxing authorities.

We agree with the Athletes that *Minich* does not guide us here, and that the City's attempt to cast *Minich* as some sort of watershed Uniformity Clause decision is

---

[35]    *Id.* at 18-19.

[36]    *Id.* at 19.

[37]    *Id.*

[38]    *Minich*, 77 A.2d at 350 ("There is . . . no such classification between residents and non-residents of the City of Sharon as plaintiffs envisage.").

[39]    *Id.*

unpersuasive.[40] *Minich* did not embrace a "functional analysis"[41] that permits taxing authorities to manufacture uniformity by aggregating distinct taxes—imposed upon distinct classes—into an "overall tax" that is roughly equal. Instead, the *Minich* Court applied established Uniformity Clause principles and reached the conclusion that a facially neutral tax and a facially neutral system of credits (available to both residents and nonresidents alike) did not violate the Uniformity Clause. Simply put, *Minich* did not embrace any of the broad legal principles that the City attempts to read into the decision.[42] And it certainly did not "align Pennsylvania's Uniformity [Clause] jurisprudence with the national mainstream on uniformity of taxation."[43]

---

[40] Brief for Appellees at 34 (stating that "there was nothing revolutionary about *Minich*'s holding"); *id.* at 31-32 ("*Minich* broke no new ground [and] introduced no new 'principles.' It also did not herald a new 'functional' analysis under the Uniformity Clause, or permit aggregating disparate taxes into an 'overall tax burden.' Instead, *Minich* applied the usual constitutional standards to conclude that a scheme of facially neutral taxes and facially neutral tax credits, available to residents and nonresidents alike, did not violate the Uniformity Clause.").

[41] Brief for the City of Pittsburgh at 19. As we have explained in prior cases, our Uniformity Clause is "only sometimes in alignment" with the standards applicable to the Fourteenth Amendment's Equal Protection Clause. *Mount Airy #1, LLC*, 154 A.3d at 274 ("[W]e have struck down numerous tax statutes that unquestionably would survive the highly deferential rational basis review attendant to a federal Equal Protection challenge."); *see, e.g.*, *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 913 A.2d 194, 201 n.9 (Pa. 2006) (holding that, unlike the Uniformity Clause, "the United States Constitution does not require equalization across all potential sub-classifications of real property"); *Amidon*, 279 A.2d at 53 (holding that the Internal Revenue Code's personal exemptions, deductions, and other tax preferences violated the Uniformity Clause); *Kelley v. Kalodner*, 181 A. 598, 602 (Pa. 1935) (holding that a graduated-rate income tax violates the Uniformity Clause).

[42] *See id.* at 20 ("*Minich* also makes clear that Pennsylvania taxes may distinguish between residents and nonresidents, particularly when the tax equalizes the overall tax burden among them."); *id.* at 22 ("Under *Minich* and the principles discussed above, the Facility Fee survives rational-basis review."); *id.* at 28 (suggesting that *Minich* aligned our Uniformity Clause case law with "national" jurisprudence).

[43] *Id.* at 28.

We agree with the Athletes that the facility fee is unconstitutional for the same reason that the tax we struck down in *Danyluk v. Bethlehem Steel Co.*[44] was unconstitutional. *Danyluk* involved a $10 "occupational tax" that the City of Johnstown imposed upon nonresidents who engaged in an occupation within the city. Johnstown residents were not subject to the occupational tax, although they did pay a $10 per capita tax that nonresidents did not have to pay. Nonresidents challenged the occupational tax on Uniformity Clause grounds, arguing that the tax unconstitutionally singled out nonresidents.

The *Danyluk* Court ultimately ruled the tax unconstitutional, although the extent to which the Court's holding rested on Uniformity Clause grounds is debated. Two thirds of the *Danyluk* Court's analysis are dedicated to establishing that the City of Johnstown's "occupational tax" was not really an occupational tax at all. The Court instead deemed the tax a per capita (or "capitation") tax, which it said cities cannot impose upon nonresidents. Specifically, the Court stated that the challenged tax:

> bears none of the incidents of an occupation tax[,] which is a flat rate levy measured by the assessed value of a man's occupation. Consequently, in a true occupation tax the amount of the levy varies with the assessed value of a particular mode of employment. Here, no distinctions among occupations are made, a fixed ten dollar levy falling upon all non-residents. Consequently, per capita, capitation[,] or head taxes can be imposed only upon residents of the particular political subdivision since residence alone furnishes the contact necessary to render a person amenable to the direct levy.
>
> Capitation or poll taxes are taxes of a fixed amount upon all persons, or upon all the persons of a certain class, within the jurisdiction of the taxing power, without regard to the amount of their property or the occupations or business in which they may be engaged. The tax is imposed because of the protection which a governmental unit affords to persons residing therein, and is designed primarily to require contribution from all residents for the services rendered them by the taxing authority. Consequently, per capita,

---

[44]    178 A.2d 609 (Pa. 1962).

capitation or head taxes can be imposed only upon residents of the particular political subdivision since residence alone furnishes the contact necessary to render a person amenable to the direct levy.[45]

The *Danyluk* Court perhaps could have ended its analysis there; if Johnstown's tax was a per capita tax on nonresidents—and if cities cannot impose per capita taxes on nonresidents—then there is nothing more to be said. But the Court went on to explain that:

> Residence cannot be made the basis of discrimination in taxation of persons engaged in the same occupation or profession. To permit such distinction would be contrary to the well-established principle that the test of the validity of a classification is whether it produces diversity in results or lack of uniformity in its operation either on the given subject of tax or the persons affected as payers. *Biddle Appeal*, 135 A.2d 915 (Pa. 1957). Here the basis of the classification is unreasonable and is violative of [the Uniformity Clause] of the Pennsylvania Constitution.[46]

This Court has suggested that *Danyluk*'s Uniformity Clause analysis was "dictum."[47] While that is one possible interpretation of an admittedly hard-to-parse decision, it would be a mistake to write *Danyluk* out of our Uniformity Clause jurisprudence entirely.[48] The *Danyluk* Court correctly recognized that the City of Johnstown was attempting to impose a discriminatory tax on nonresidents, which it justified by pointing to a tax on residents that, by its very nature, did not apply to nonresidents. *Danyluk*, in other

---

[45]     *Id.* at 610.

[46]     *Id.* at 610-11.

[47]     *Leonard*, 489 A.2d at 1352 (describing *Danyluk* as holding that a capitation tax on non-residents is "unauthorized and invalid, with dictum indicating that an occupation tax levied only against non-residents would violate constitutional uniformity standards"); *accord* Brief for City of Pittsburgh at 27 ("Any reference in *Danyluk* to the residency distinction violating the Uniformity Clause was dicta[.]").

[48]     We note that the only issue raised in *Danyluk* was a Uniformity Clause challenge, and the *Danyluk* Court's bottom-line conclusion was that "[t]he present tax . . . violates the provisions of the uniformity provision of the Pennsylvania Constitution and must be invalidated." *Danyluk*, 178 A.2d at 611. This suggests that *Danyluk*'s Uniformity Clause analysis was essential to the Court's holding and not mere dictum.

words, correctly held that a per capita tax that could only be imposed upon residents could not be used to justify a disuniform occupational tax on nonresidents. *Danyluk* should be understood for the proposition that a city cannot use a tax which, of necessity, only applies to residents to cover up the discriminatory effect of a separate, disuniform tax on nonresidents. In such circumstances, it cannot be said that the disuniform tax on nonresidents is necessary "to equalize tax treatment between classes"[49] because no underlying disuniformity exists in the first place.

Because the two percent Pittsburgh School District tax cannot be used to justify the facility fee in our Uniformity Clause analysis, and because the City of Pittsburgh has not supplied a "concrete justification"[50] for treating resident athletes and entertainers differently from nonresident athletes and entertainers, we agree with the lower courts that the facility fee is unconstitutional.

We affirm.

Justices Dougherty, Mundy, Brobson and McCaffery join the opinion.

Justice Donohue files a concurring opinion in which Chief Justice Todd joins.

Justice Mundy files a concurring opinion.

---

[49]     Brief for City of Pittsburgh at 23 (quoting *Nat'l Hockey League Players Ass'n*, 308 A.3d at 328 (Cohn Jubelirer, P.J., dissenting)).

[50]     *See Leonard*, 489 A.2d at 1352 ("[T]the focus of judicial review is upon whether there can be discerned 'some concrete justification' for treating the relevant group of taxpayers as members of distinguishable classes subject to different tax burdens." (quoting *Columbia Gas Corp*., 360 A.2d at 595-97)).