[J-72A-2025 and J-72B-2025] [MO: Mundy, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 45 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 92 |
| | : | CD 2022 dated October 6, 2023, |
| | : | Reversing the Order of the |
| CHESTER COUNTY BOARD OF | : | Chester County Court of Common |
| ASSESSMENT APPEALS | : | Pleas, Civil Division, at No. 2019- |
| TAX PARCEL NO.: 33-5-43.3 | : | 11728-AB dated January 18, 2022 |
| | : | |
| | : | ARGUED:  September 11, 2025 |
| APPEAL OF:  DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |
| | | |
| DOWNINGTOWN AREA SCHOOL DISTRICT | : | No. 46 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 93 |
| | : | CD 2022 dated October 6, 2023, |
| | : | Reversing the Order of the |
| CHESTER COUNTY BOARD OF | : | Chester County Court of Common |
| ASSESSMENT APPEALS | : | Pleas, Civil Division, at No. 2019- |
| TAX PARCEL NO.: 33-5-43.2 | : | 11727-AB dated January 18, 2022 |
| | : | |
| | : | ARGUED:  September 11, 2025 |
| APPEAL OF: DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | |

<u>**DISSENTING OPINION**</u>

**JUSTICE DOUGHERTY**                          **DECIDED:  May 19, 2026**

The text of the Uniformity Clause of the Pennsylvania Constitution plainly reflects its animating principles: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."  PA. CONST. art. 8, §1.  By adopting the Uniformity Clause, the people

of this Commonwealth "placed the seal of their approval upon a system of taxation which has for its corner stone uniformity in the valuation, levy, and collection of all taxes." *Delaware, L. & W. R. Co.'s Tax Assessment*, 73 A. 429, 430 (Pa. 1909). Thus, "[i]t is the duty of the courts in dealing with this subject to enforce as nearly as may be" not only "equality of burden[,]" but also "uniformity of **method** in determining what share of the burden each taxable subject must bear." *Id.* (emphasis added).

Because the majority approves a method for taxing districts to choose which property assessments to appeal pursuant to their authority under Section 8855 of the Consolidated County Assessment Law,[1] which method applies only to a small subset of properties — those that will make the most money for the taxing district — I respectfully dissent. Specifically, I conclude the majority opinion is contrary to our Uniformity Clause jurisprudence in three main respects: (1) by holding monetary thresholds constitutional; (2) by holding the Downingtown Area School District's (School District) method for selecting properties among those meeting the threshold was constitutional, and relatedly, that "tax-liability deficit" is a valid metric for identifying the most non-uniform assessments; and (3) by asserting "[t]he Uniformity Clause focuses on purposeful differential **treatment**, not differential **impact**." Majority Opinion at 30 (emphasis in original). I address each of those holdings in turn.[2]

---

[1] "A taxing district shall have the right to appeal any assessment within its jurisdiction in the same manner, subject to the same procedure and with like effect as if the appeal were taken by a taxable person with respect to the assessment, and, in addition, may take an appeal from any decision of the board or court of common pleas as though it had been a party to the proceedings before the board or court even though it was not a party in fact. A taxing district authority may intervene in any appeal by a taxable person under section 8854 (relating to appeals to court) as a matter of right." 53 Pa.C.S. §8855.

[2] I note up front that this dissenting opinion overlaps to some extent with Justice Donohue's dissenting opinion, which I join in full.

## I. Monetary Thresholds

I begin with the undisputed premise that the Uniformity Clause's requirements apply to taxing districts' policies for choosing which assessments to appeal. Most relevantly, in *Valley Forge Towers Apartments N, LP v. Upper Merion Area School District*, we struck down a policy where the school district concentrated on appealing commercial properties only. *See* 163 A.3d 962 (Pa. 2017). In doing so, we distilled two principles from our prior case law: "First, all property in a taxing district is a single class, and, as a consequence, the Uniformity Clause does not permit the government, including taxing authorities, to treat different property sub-classifications in a disparate manner." *Id.* at 975, *citing Clifton v. Allegheny Cty.*, 969 A.2d 1197, 1212 (Pa. 2009), *and Westinghouse Elec. Corp. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*, 652 A.2d 1306, 1314 (Pa. 1995) ("all real estate is a constitutionally designated class entitled to uniform treatment and the ratio of assessed value to market value adopted by the taxing authority must be applied equally and uniformly to all real estate within the taxing authority's jurisdiction"). "Second, this prohibition applies to any intentional or systematic enforcement of the tax laws, and is not limited solely to wrongful conduct." *Id.*, *citing Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 913 A.2d 194, 201 n.10 (Pa. 2006) (explaining "similarly situated taxpayers should not be deliberately treated differently by taxing authorities[,]" and "the term 'deliberate' does not exclusively connote wrongful conduct, but also includes any intentional or systematic method of enforcement of the tax laws").

In line with those precepts, we rejected the school district's argument that a conventional rational-basis standard applied. *See id.* at 977. Although the General Assembly has "power to classify, even in matters of taxation, so that a taxpayer generally must demonstrate that the classification 'is unreasonable and not rationally related to any

legitimate state purpose[,]'" we explained that "property taxes are 'different' because 'real property **is** the classification.'" *Id.*, *quoting Clifton*, 969 A.2d at 1211-12 (emphasis in original). Thus, "all real estate in a taxing district is constitutionally entitled to uniform treatment." *Id.*, *citing Clifton*, 969 A.2d at 1212 ("this Court has consistently interpreted the uniformity requirement of the Pennsylvania Constitution as requiring all real estate to be treated as a single class entitled to uniform treatment"). With that legal background, we held "it follows that a taxing authority is not permitted to implement a program of only appealing the assessments of one sub-classification of properties, where that sub-classification is drawn according to property type — that is, its use as commercial, apartment complex, single-family residential, industrial, or the like." *Id.* at 978.

In *Valley Forge*, we also rejected an argument forwarded by *amici* that the appellants' pleadings "were insufficient in that all assessment appeals reduce the [coefficient of dispersion[3]] and, in that sense, enhance uniformity." *Id.* at 979. We explained that "argument overlooks that the Uniformity Clause can be independently harmed by a systematic course of disparate treatment relative to a particular sub-classification of property." *Id.* We elaborated that "[a]lthough the aim of every such appeal is to conform the property's assessment with the [common level ratio (CLR)[4]], the members of the sub-class are aware that they alone have been targeted for scrutiny solely due to their membership in the sub-class; moreover, they alone must bear the costs of defending against the appeal and of any follow-up litigation in court[.]" *Id.* Nor were we swayed by the fact the school district's method would result in a greater tax-revenue

---

[3] The coefficient of dispersion is "the average variance from the common assessment ratio in a district." *Valley Forge*, 163 A.3d at 976.

[4] The CLR is the ratio of assessed value to current market value used generally in the county, as calculated by the State Tax Equalization Board (STEB) based on arms-length real estate sales (except for outliers). *See Valley Forge*, 163 A.3d at 966 n.2.

increase.  *See id.* at 979-80 ("The government must be concerned with ensuring a rough equalization of tax burdens under a structure in which taxes are imposed, adjusted, and collected equitably. . . . Where there is a conflict between maximizing revenue and ensuring that the taxing system is implemented in a non-discriminatory way, the Uniformity Clause requires that the latter goal be given primacy.").

Today, the majority holds the School District's use of a monetary threshold (*i.e.*, its consideration of properties to appeal only if they would potentially result in total annual additional tax revenue of $10,000) is permissible under the Uniformity Clause.  It reasons that "[w]here a taxing district's policy along these lines does not create a prohibited subclass of properties defined by an impermissible characteristic such as type, use, neighborhood, or residency status of the owner, it tends to enhance uniformity by selecting for appeal the properties whose assessments are the most nonuniform in terms of their tax-liability deficit."  Majority Opinion at 9 (footnotes omitted).  The majority expands on its position, stating that "[b]ringing these assessments in line with the CLR means the property's assessment ratio is still less than about half of the other properties in the county, but it is no longer an outlier.  This, in turn, enhances fairness to the remaining taxpayers who would otherwise need to pay more of the cost of government than their proportionate share, as the taxing district would otherwise have to raise its millage to meet budgetary needs."  *Id.*  "Furthermore," the majority believes, "a taxing district's use of a monetary threshold to ensure its efforts are not a net drain on the public fisc reflects an effort by the district to handle public funds in a responsible and judicious manner based on a cost-benefit analysis."  *Id.* at 9-10 (footnote omitted).  It notes that in *Valley Forge*, we left open the possibility that the Uniformity Clause might permit monetary thresholds.

Although I acknowledge our clarification in *Valley Forge* "that nothing in this opinion should be construed as suggesting that the use of a monetary threshold . . . or some other selection criteria would violate uniformity if it were implemented without regard to the type of property in question or the residency status of its owner[,]" 163 A.3d at 979, I emphasize this statement was mere *dicta*, clarifying the bounds of the case before us. *See id.* ("Such methodologies are not presently before the Court."). With the issue before us now, I would hold that the School District's monetary threshold cannot be squared with the other principles announced in *Valley Forge*.

On its face, the School District's monetary threshold creates (at least) two subclasses of property: those whose reassessments would net an additional $10,000 of tax revenue for the School District, and those whose reassessments would be less valuable to the School District. To put it another way, the policy separates properties based on the appreciation of their value, as demonstrated by Valbridge's table below, showing the threshold value increase needed for properties in each municipality to meet the $10,000 threshold:

| | Value/IMV | Ratio | Asmt | Mills | Taxes | Threshold Value Increase |
|---|---|---|---|---|---|---|
| Downingtown | $1,000,000 | 51.30% | $513,000 | 39.201 | $20,110 | |
| | $1,497,262 | 51.30% | $768,096 | 39.201 | $30,110 | $497,262 |
| E Brandywine | $1,000,000 | 51.30% | $513,000 | 34.416 | $17,655 | |
| | $1,566,399 | 51.30% | $803,563 | 34.416 | $27,655 | $566,399 |
| E Caln | $1,000,000 | 51.30% | $513,000 | 32.801 | $16,827 | |
| | $1,594,286 | 51.30% | $817,869 | 32.801 | $26,827 | $594,286 |
| U Uwchlan | $1,000,000 | 51.30% | $513,000 | 32.585 | $16,716 | |
| | $1,598,225 | 51.30% | $819,890 | 32.585 | $26,716 | $598,225 |
| Uwchlan | $1,000,000 | 51.30% | $513,000 | 31.671 | $16,247 | |
| | $1,615,490 | 51.30% | $828,746 | 31.671 | $26,247 | $615,490 |
| Wallace | $1,000,000 | 51.30% | $513,000 | 31.551 | $16,186 | |
| | $1,617,831 | 51.30% | $829,947 | 31.551 | $26,186 | $617,831 |
| W Bradford | $1,000,000 | 51.30% | $513,000 | 31.551 | $16,186 | |
| | $1,617,831 | 51.30% | $829,947 | 31.551 | $26,186 | $617,831 |
| W Pikeland | $1,000,000 | 51.30% | $513,000 | 32.351 | $16,596 | |
| | $1,602,553 | 51.30% | $822,109 | 32.351 | $26,596 | $602,553 |

Ex. M-5 at 2 (unpaginated).[5] Thus, in West Bradford Township, for example, the properties were split into two subclassifications: those that had risen at least $617,831 in

---

[5] Valbridge was the third-party the School District used to identify properties to appeal. When asked to explain the column for "Threshold Value Increase" in Exhibit M-5, Valbridge employee Reaves Lukens testified, "[i]n order to generate $10,000 in additional (continued…)

value, and those that had not. And under the School District's policy, only those in the former category were subject to the possibility of an assessment appeal. Not to mention, of course, that these dollar amounts varied by municipality, creating subclassifications within the subclassifications created by the $10,000 threshold. *See* N.T., 11/17/21, at 35 (Lukens affirming that "depending upon what township you're in, the same property in one township might trigger a reassessment while in another township it wouldn't"). Thus, only certain property owners are subject to the burdens associated with school district assessment appeals, *see Valley Forge*, 163 A.3d at 979, based on subclassifications defined by their property's value increase and municipality.[6] In fact, as pointed out by the majority, "the evidence suggests over 100 properties out of the 28,000 situated within the School District met the $10,000 threshold." Majority Opinion at 15. That means that only 0.4% to 0.7% of the properties in the School District were even exposed to the possibility of a Section 5588 assessment appeal. *Cf.* PA. CONST. art. 8, §1 ("All taxes . . . shall be levied and collected under general laws").[7]

---

revenue . . .[,] the value pick up needs to be at or exceed that amount in that column." N.T., 11/17/21, at 35. Lukens did not explain why the "ratio" in the chart was set at 51.30%, but to be clear, the parties stipulated to CLRs for each of the relevant years: 49.3% for 2020, 47% for 2022, and 45% for 2022. *See id.* at 6.

[6] The majority disposes of the Taxpayer's argument that the varying millage rates among the different municipalities in the School District caused disparities in application of the monetary threshold by reasoning "the existence of these different millage rates is a function of local law as enacted in different municipalities . . . and it would be a strained reading of the Uniformity Clause to conclude it permits the use of a monetary threshold only where, by happenstance, the cumulative millage rate is identical for all properties within the school district's boundaries." Majority Opinion at 12 (reciting precept we are only concerned with "rough" uniformity). This reasoning presupposes the validity of monetary thresholds, but in my view, the varying millage rates within a taxing district are yet another reason monetary thresholds contradict uniformity in the first place.

[7] On this point, the majority observes that more than sixteen properties satisfied the threshold, and it rejects the Commonwealth Court's purported disapproval of the policy because the School District "did not appeal all properties with a projected tax-liability deficiency of at least $10,000." Majority Opinion at 14. According to the majority, "[s]uch (continued…)

Where our law is explicit that "real property **is** the classification" and "that all real estate in a taxing district is constitutionally entitled to uniform treatment[,]" I cannot make sense of the majority's conclusion that the School District's monetary threshold complies with the Uniformity Clause. *Valley Forge*, 163 A.3d at 977, *quoting Clifton*, 969 A.2d at 1212 (emphasis in original). No sincere argument exists that the School District's policy does not create subclassifications. It appears, however, the majority simply does not believe they are "**prohibited** subclass[es] of properties defined by an impermissible characteristic such as type, use, neighborhood, or residency status of the owner[.]" Majority Opinion at 9 (emphasis added). However, the majority does not provide a reason for its implicit holding that **some** subclasses of real property are acceptable notwithstanding our wealth of case law to the contrary. *See, e.g.*, *Valley Forge*, 163 A.3d at 977; *Clifton*, 969 A.2d at 1212 ("[T]his Court has consistently interpreted the uniformity requirement of the Pennsylvania Constitution as requiring all real estate to be treated as a single class entitled to uniform treatment"); *id.* at 1213 ("judicial review of uniformity challenges to a statutory scheme of property taxation often needs only to focus on . . .

---

a rule is impractical and finds no support in the Uniformity Clause's text or history." Majority Opinion at 16. In my view, the relevant sentence from the Commonwealth Court's opinion — "the School District's decision to undertake a piecemeal implementation of this [monetary threshold] policy, deliberately leaving many other underassessed properties alone, has created disparate treatment that is anathema to the Uniformity Clause" — is being taken out of context. *Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 303 A.3d 1104, 1114 (Pa. Cmwlth. 2023). Where the Commonwealth Court reasoned the School District implemented its policy in an arbitrary fashion, I do not read this portion of its opinion as suggesting the School District had to appeal **all** properties meeting the threshold. Instead, it appears the Commonwealth Court believed that where the School District knew other properties met the monetary threshold, it needed to apply its policy in some principled, non-arbitrary manner. In the very next sentence, the Commonwealth Court concluded: "This **random application** of a monetary threshold created a lack of uniformity in violation of the Pennsylvania Constitution." *Id.* (emphasis added). Regardless, I would leave this issue for another day, as I would not foreclose the possibility that 53 Pa.C.S. §8855 is itself unconstitutional precisely because it allows interested taxing authorities like school districts to selectively appeal only certain assessments.

whether the statute results in **a** 'classification' — because in the property taxation context, **any disparity** in tax liability, beyond the expected practical inequities, most likely constitutes a violation of the Uniformity Clause") (emphasis added); *Downingtown Area Sch. Dist.*, 913 A.2d at 201 n.9 (contrasting the Pennsylvania Constitution with the federal charter by explaining "the United States Constitution does not require equalization across **all potential sub-classifications** of real property") (emphasis added); *Westinghouse*, 652 A.2d at 1314 ("all real estate is a constitutionally designated class entitled to uniform treatment"); *Deitch Co. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*, 209 A.2d 397, 402 (Pa. 1965) ("the uniformity requirement of the Constitution of Pennsylvania has been construed to require that all real estate is a class which is entitled to uniform treatment"); *McKnight Shopping Ctr., Inc. v. Bd. of Prop. Assessment, Appeals & Review of Allegheny Cty.*, 209 A.2d 389, 392 (Pa. 1965) ("it is clear that **all** real estate is the class entitled to uniform treatment") (emphasis in original). To be sure, we have never created an exception to that rule for real estate that has risen substantially in fair market value, just because such an exception would financially benefit taxing authorities who could recover greater tax revenues by targeting those properties.[8]

---

[8] Respectfully, the majority engrafts a strawman argument onto my reasoning, claiming I define the subclass "simply as those parcels the School District chooses to appeal[.]" Majority Opinion at 22 n.25. To be clear, that is not the classification created by the monetary threshold; the subclassification I discuss is properties meeting the monetary threshold based on their increase in fair market value. And I repeat that "I would leave this issue [regarding the constitutionality of Section 8855] for another day[.]" *Supra* at 7-8 n.7. Indeed, the subclassification articulated by the majority would not be a relevant subclassification for purposes of a Uniformity Clause analysis — "those parcels the School District chooses to appeal" would be the result of the School District's exercise of its Section 8855 authority, while here, the Uniformity Clause is concerned with the School District's use of subclassifications when deciding which properties to appeal. Regardless, by redefining the "subclassification" in the broadest terms, the majority manufactures a "tension whereby taxes inevitably become non-uniform as time goes on, but any attempt to correct the same via Section 8855 cannot help but 'treat' some properties differently by correcting their assessments and bringing them into line with the CLR." Majority Opinion (continued…)

Nor does the majority explain what makes increase in fair market value a permissible characteristic, while type, use, neighborhood, and residency status are "impermissible[.]" Majority Opinion at 9. Indeed, in *Clifton* (discussed in more detail *infra*), we expressly rejected classifications based on distinctions in the appreciation or depreciation of property values. There, we explained that even if classifications were permissible in the property-taxation context, the taxing authority (Allegheny County in that case) "d[id] not base its supposed classification on any legitimate distinction" where it "permit[ted] the inevitable vicissitudes of the real estate market to define the 'classification' at issue, and then attempt[ed] an after-the-fact explanation why such non-uniform treatment [wa]s allowable." *Clifton*, 969 A.2d at 1229. We further explained the county's justifications of promoting stability and predictability "cannot justify a taxing scheme that routinely taxes property owners with declining or stagnant property values at a higher rate of assessed-to-actual value than property owners with stable or

___

at 22 n.25. And because "[t]he constitutional text focuses on **taxes** being uniform," the majority posits, "[t]his requires us to resolve the aforementioned tension in favor of uniformity of tax rate over uniformity of obligation to defend against an assessment appeal." *Id.* (emphasis in original). But our Constitution does not speak in terms of tax rates only: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, **and shall be levied and collected under general laws**." PA. CONST. art. 8, §1 (emphasis added). Indeed, for well over a century, we have interpreted this language as imposing a "duty [upon] the courts in dealing with this subject to enforce as nearly as may be equality of burden **and uniformity of method in determining what share of the burden each taxable subject must bear**." *Delaware, L. & W. R.,* 73 A. at 430 (emphasis added). The majority's suggestion that the Uniformity Clause is concerned with tax rates at the expense of assessment methodologies implicitly overrules this "corner stone" of our law requiring "uniformity in the valuation, levy, and collection of all taxes." *Id.*; *see also Valley Forge*, 163 A.3d at 978 ("systematic disparate enforcement of the tax laws based on property sub-classification, even absent wrongful conduct, is constitutionally precluded"); *id.* at 979 ("The government must be concerned with ensuring a rough equalization of tax burdens under a structure in which taxes are imposed, adjusted, and collected equitably."). Of course, "when taxes become nonuniform due to market forces," the government has a duty to take corrective action. Majority Opinion at 22 n.25. But that cannot mean that taxing authorities are allowed to commit other violations of the Uniformity Clause to do so.

appreciating property values."  *Id.* (additionally reasoning the classification was not rationally related to the purported governmental interest).  If "property owners with declining or stagnant property values" is an impermissible classification, *id.*, then so too is its inverse: "property owners with rising property values."  In sum, no distinction could legitimately support any subclass of real property, where our case law forbids such subclassification across the board.  But even if classifications were permitted in this context (they're not), classification based on changes in market value is, to use the majority's term, "prohibited."  Majority Opinion at 9.[9]  I would therefore hold the School District's monetary threshold unconstitutional.

## II.  Unconstitutional Application of the School District's Policy

Even assuming, *arguendo*, that monetary thresholds can comply with the Uniformity Clause, the School District's application of its policy was still unconstitutional here, where it did not meaningfully apply the threshold at all.[10]  Instead, it simply selected the properties with the greatest value increases by dollar amount (because those would lead to the greatest return).  *See* Dissenting Opinion at 7 (Donohue, J.) ("Under this framework, monetary thresholds merely serve as a guise for policies seeking to appeal

---

[9] Plus, as Justice Donohue aptly observed in her Opinion in Support of Reversal in *GM Berkshire Hills LLC v. Berks County Board of Assessment*, "[s]uch [monetary] thresholds could easily serve as methods of circumventing our holdings in cases such as *Clifton* and *Valley Forge Towers*, as they could be set at amounts that would largely target only certain neighborhoods (*i.e.*, those known to contain more expensive homes), property uses (large apartment buildings vs. small single-family homes), or types (commercial vs. residential)." 290 A.3d 238, 253 n.5 (Pa. 2023) (Donohue, J., OISR) ("Under both *Clifton* and *Valley Forge Towers*, such pretextual thresholds would run afoul of the Uniformity Clause, regardless of whether they were intentionally created.").

[10] In fact, it is questionable whether the majority even needed to decide whether monetary thresholds are constitutional, given that the Commonwealth Court did not base its holding on the validity of the monetary threshold and the threshold was not dispositive to the selection of properties to appeal in any event.  *See In re Fiori*, 673 A.2d 905, 909 (Pa. 1996) ("courts should avoid constitutional issues when the issue at hand may be decided upon other grounds").

only those properties with the highest value.").  Any justification for a monetary threshold based on the School District's need to ensure its ability to recoup the costs of the appeal does not apply when selecting among properties above that threshold.  And here, the only selection criterion for properties above the threshold, which the majority blesses, was simply to "maximize the return" for the School District.  Majority Opinion at 25.  Under that criterion, the threshold becomes irrelevant — the threshold could have been $100 (a facially neutral threshold that could easily apply to all types of property), yet the same properties would have been selected.  But in my view, selecting properties for more burdensome tax treatment based purely on maximizing return to the taxing authority is anathema to the Uniformity Clause.  *See Delaware L. & W. R. Co.'s Tax Assessment*, 73 A. at 430 ("It is the duty of the courts . . . to enforce as nearly as may be equality of burden and **uniformity of method** in determining what share of the burden each taxable subject must bear.") (emphasis added).

Even if we chose to read *Valley Forge* narrowly as allowing **some** subclassification of real property when deciding which assessments to appeal, a subclassification based on increased actual value, by dollar amount, is intolerable under our Uniformity Clause jurisprudence.  As explained above, in *Clifton* we disapproved of Allegheny County's use of "inevitable vicissitudes of the real estate market to define the 'classification' at issue[.]" *Clifton*, 969 A.2d at 1229.  Likewise, in other taxation contexts, we do not allow taxing authorities to discriminate based on monetary value.  Indeed, only ten years ago, we decided *Mount Airy #1, LLC v. Pennsylvania Department of Revenue*, which involved a tax imposed by the General Assembly in the Pennsylvania Race Horse Development and Gaming Act.  *See* 154 A.3d 268 (Pa. 2016).  The statute required, *inter alia*, that casinos located outside of Philadelphia pay a municipal local share assessment of either 2% of their Gross Terminal Revenue (GTR) — *i.e.*, amounts received by slot machines minus

amounts paid out to players — or a lump sum of $10 million, whichever was greater. *See id.* at 271. This meant that those casinos that earned GTRs at or below $500 million always paid $10 million dollars, while those that earned GTRs above $500 million always paid above $10 million. *See id.* We held the General Assembly's revenue-based classification violated uniformity.

In doing so, we explained:

When the validity of a tax classification is challenged, the relevant inquiry is whether the classification is based upon some **legitimate distinction** between the classes that provides a non-arbitrary, reasonable, and just basis for the disparate treatment. We must decide whether there exists "some concrete justification" for treating the relevant group of taxpayers as members of distinguishable classes subject to different tax burdens. Absent such a justified distinction between the classes, the imposition of substantially unequal tax burdens upon similarly situated persons violates the Uniformity Clause.

*Id.* at 274 (citations omitted, emphasis added).

Relying on multiple of this Court's precedents, we explained "[t]he basic principle that '[t]he money value of **any given kind of property** . . . can never be made a legal basis of subdivision or classification for the purpose of imposing unequal burdens on [similarly situated] classes,' . . . has endured through the years." *Id.* at 275 (emphasis added), *quoting In re Cope's Estate*, 43 A. 79, 81-82 (Pa. 1899); *also citing Amidon v. Kane*, 279 A.2d 53 (Pa. 1971) (tax purporting to apply flat rate to income, as established by federal standards and with federal exemptions, violated uniformity); *Saulsbury v. Bethlehem Steel Co.*, 196 A.2d 664 (Pa. 1964) (striking down ordinance imposing tax on individuals engaged in an occupation with gross earnings of $600 or more); *Kelley v. Kalodner*, 181 A. 598 (Pa. 1935) (graduated income tax violates uniformity).

In line with those cases, we concluded "the General Assembly essentially created a variable-rate tax, fashioning one rate for non-Philadelphia casinos with GTR below $500 million, and another for non-Philadelphia casinos with GTR greater than $500 million." *Id.*

at 276. We held "[o]ur case law teaches that such quantitative distinctions lack uniformity because **any 'classification that is based solely on a difference in quantity of precisely the same kind of property is necessarily unjust, arbitrary, and illegal**.'" *Id.*, *quoting Cope's Estate*, 43 A. at 81 (emphasis added). Further, we were not swayed by the Department of Revenue's rationale that the tax scheme was rational because it would provide a significant source of new revenue. *See id.* at 278. "This is beside the point[,]" we concluded. *Id.* "Were we to hold that the legislature's mere desire to increase tax revenue empowers it to impose non-uniform taxes, we would nullify the Uniformity Clause." *Id.*

Here, where the subclassification for selection of properties to appeal is based on the amount a property has appreciated in actual value, I do not see how the School District's methodology can comply with these precedents. I recognize that *Mt. Airy #1* involved a rate challenge rather than a challenge to assessment appeal methodology, but I see no reason why its rule would not apply in equal force here, especially where our law imposes more stringent rules about classifications in the real property context. *See Clifton*, 969 A.2d at 1212 ("Property taxation[ ] is different."). In either context, the Uniformity Clause does not allow taxing authorities to discriminate against property owners based on the value of their property when imposing burdens.

In the same vein, I respectfully disagree with the majority's assertion that tax-liability deficit is an acceptable metric for identifying the most nonuniform properties in a district. As defined by the majority, "[a] property's 'tax-liability deficit' is the difference between the property's current tax liability and what that liability would be if the property's assessment ratio — that is, the ratio of the property's assessed value to its fair market value, *see Valley Forge*, 163 A.3d at 966 n.1 — were to be conformed to the CLR." Majority Opinion at 8 n.8. But uniformity is about everyone paying their "fair share of the

cost of government." *Valley Forge*, 163 A.3d at 979. It is for that reason that we require tax liability to be proportionate to value. *See id.* at 973 ("it [is] an established feature of Pennsylvania uniformity jurisprudence that 'all real estate is a constitutionally designated class entitled to uniform treatment and the **ratio** of assessed value to market value adopted by the taxing authority must be applied equally and uniformly to all real estate within the taxing authority's jurisdiction'") (emphasis added), *quoting Westinghouse*, 652 A.2d at 1314; *Downingtown Area Sch. Dist.*, 913 A.2d at 199 ("a taxpayer is entitled to relief under the Uniformity Clause where his property is assessed at a higher **percentage of fair market** value than other properties throughout the taxing district") (emphasis added); *Appeal of F.W. Woolworth Co.*, 235 A.2d 793, 795 (Pa. 1967) ("uniformity has as its heart the equalization of the **ratio** among [a]ll properties in the district") (emphasis added); *Commonwealth ex rel. Dep't of Justice v. A. Overholt & Co.*, 200 A. 849, 853 (Pa. 1938) ("when taxes are levied upon property there must be an **apportionment** with reference to a uniform standard, or they degenerate into mere arbitrary exactions") (emphasis added), *quoting* Cooley, 2 Constitutional Limitations at 1040 (8th Ed.); *Del., L. & W. R. Co.'s Tax Assessment*, 73 A. at 430 (Uniformity Clause requires that "[t]he large property owner and the small holder pay upon the same **ratio**") (emphasis added). In this context, we have no reason to apply a blunt dollar-amount metric like tax-liability deficit to measure uniformity (or lack thereof) rather than a metric that accounts for one's proportionate share.

If we use tax-liability deficit as the measuring stick for lack of uniformity, higher value properties are more likely to be considered more nonuniform just because they have a higher tax liability to begin with. For example, imagine a single-family home that is assessed at only 25% of its fair market value (using round numbers, imagine it is assessed at $100,000 but its actual value is $400,000), versus an apartment complex

that is assessed at 40% of its fair market value (imagine it is assessed at $4 million but its actual value is $10 million). If the CLR were 50% (assuming the CLR applies rather than the established predetermined ratio), the home would be underassessed by $100,000 ($400,000 multiplied by 50%, minus $100,000), and the apartment complex would be underassessed by $1 million ($10 million times 50%, minus $4 million). The apartment complex is paying closer to its **proportional** share, but if tax-liability deficit is the metric used to select properties to appeal, it will be chosen over the single-family home every time.[11] The majority opines that "[i]f market forces change so that single-family residences rise in value compared to commercial properties, it is expected that more residential properties will be appealed at that juncture." Majority Opinion at 28. But the majority does not show its math. I question the likelihood that if an average single-family home one day meets the $10,000 threshold, it would be selected for appeal where many commercial properties would almost certainly have a higher tax-liability deficit, even if they did not "rise in value compared to" single-family residences, as the Majority

_____

[11] In *GM Berkshire Hills LLC v. Berks County Board of Assessment*, I emphasized that "[t]his Court has recognized that 'the CLR is not indicative of uniformity.'" 290 A.3d 238, 258 (Dougherty, J., OISR). I repeat my point from that case — that "the process of choosing targeted properties for appeal precisely because their difference in actual to assessed value is huge can be characterized as self-serving as easily as it can be seen as promoting uniformity[,]" *id.* at 258 n.1 — but I add that even if we use the CLR as a tool to make properties' assessments more uniform, the method accepted by the majority in this case does not further that goal. *Cf.* Majority Opinion at 9 ("Bringing these assessments in line with the CLR means the property's assessment ratio is still less than about half of the other properties in the county, but it is no longer an outlier."). As explained above, the CLR is the county-wide **ratio** of assessed value to current market value set by STEB. As demonstrated, tax-liability deficit does not necessarily identify outliers for purposes of the CLR, because a high-value property could have a high tax-liability deficit while still being assessed at a percentage of its fair market value that is relatively close the CLR. Regardless, we rejected a similar argument in *Valley Forge* that all assessment appeals necessarily promote uniformity, explaining such an "argument overlooks that the Uniformity Clause can be independently harmed by a systematic course of disparate treatment relative to a particular sub-classification of property." 163 A.3d at 979.

speculates might occur someday. *Id*.; *accord* Dissenting Opinion (Donohue, J.) at 6 ("Short of the entire collapse of all elements of the commercial realty sectors, it is hard to imagine when, if ever, the market will fluctuate in such a manner that the average single-family residence will be able to generate revenue comparable to that of commercial properties.").[12]

---

[12] We recognized this reality in *Valley Forge* when we explained why Keystone, the consultant in that case, concentrated solely on commercial properties: "They did so because these properties' values were generally higher than those of single-family homes, and hence, raising their assessments would result in a greater tax-revenue increase than doing the same with under-assessed single-family homes, **including those which were under-assessed by a greater percentage**." *Valley Forge*, 163 A.3d at 966 (emphasis added). And even beyond this case, our courts have seen the same pattern arise in other taxing districts that have implemented similar policies. *See, e.g.*, *Phoenixville Area Sch. Dist. v. Shi*, 2025 WL 2739043, at *8 (Pa. Cmwlth. Sept. 26, 2025) ("That many of the appealed properties are commercial properties located in the Phoenixville Borough business district, [is] simply because those properties satisfied the Policy's objective financial criteria."); *Coatesville Area School Dist. v. Chester Cty. Bd. of Assessment Appeals*, 323 A.3d 61, 82 (Pa. Cmwlth. 2024) (reasoning school district "was open to appealing a residential property tax assessment; it simply had not identified one yet that met the [$10,000] threshold"); *Kennett Consol. Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 228 A.3d 29, 39 (Pa. Cmwlth. 2020) ("[T]he facially neutral action employed by District is not sufficient to result in a violation of the Uniformity Clause. . . . The mere fact that all appealed properties were commercial does not *per se* create a violation of the Uniformity Clause."); *Punxsutawney Area Sch. Dist. v. Broadwing Timber, LLC*, 2019 WL 5561413, at *9 (Pa. Cmwlth. Oct. 29, 2019) ("[T]hat the District's practice **thus far** has resulted in appeals of commercial or commercially-used properties is not determinative where that practice is implemented or carried out without regard to the type or ownership of a property. . . . So far, no sale of residential properties has resulted in a high enough realty transfer tax to warrant review, and Broadwing has not presented evidence to the contrary. That is not to say that none will in the future[.]") (emphasis in original); *E. Stroudsburg Area Sch. Dist. v. Meadow Lake Plaza, LLC*, 2019 WL 5250831, at *6 (Pa. Cmwlth. Oct. 17, 2019) ("We conclude that the $10,000 threshold is reasonable and does not violate the uniformity requirement of the Pennsylvania Constitution, despite the fact that in this particular instance, only commercial properties in the School District met that threshold."); *In re Springfield Sch. Dist.*, 101 A.3d 835, 849 (Pa. 2014) ("The fact that the $500,000 threshold would mostly subject commercial properties to assessment appeals does not warrant a different conclusion."). It is not a fluke that these policies result in the disproportionate appeals of commercial/non-residential properties. I question how long our courts can, with a straight face, say that maybe someday these policies will apply equally to single-family homes.

Additionally, nothing in the School District's policy requires that the other properties in the district must be appealed before the subject properties can be re-appealed. Theoretically, only high-value properties could be subject to appeals year after year, even if their fair market value increases at a slower rate than their neighbors.[13] While this system keeps select, high-value properties assessed based on their actual value, it improperly leaves the majority of other properties in the School District under-assessed in perpetuity. *See, e.g.*, *Narehood v. Pearson*, 96 A.2d 895, 899 (Pa. 1953) ("the intentional, systematic undervaluation by state officials of taxable property of the same class belonging to other owners contravenes the constitutional right of one taxed upon the full value of his property") (citation omitted). Thus, I would hold the School District's application of its policy violated the Uniformity Clause, and I disagree with the majority's holding that tax-liability deficit is an appropriate metric for lack of uniformity.

### III. Differential Treatment Versus Differential Effect

The majority acknowledges our precedents "establish that the Uniformity Clause prohibits intentional or systematic differential treatment of subclasses of property, whether the governmental conduct is 'wrongful' or not." Majority Opinion at 30. "But[,]" it continues, "that does not mean the Uniformity Clause imports the concept of 'disparate impact' wholesale from civil rights law and applies it the same way." *Id.*, *citing Punxsutawney*, 2019 WL 5561413, at *5. Instead, according to the majority:

---

[13] For further illustration, the parties stipulated the two parcels owned by Marchwood Apartments Owners LLC (Taxpayer) had the following fair market values for the relevant years: for the 6.1 acre parcel, $11,035,500 as of January 1, 2020, and $11,445,000 as of January 1, 2021, and January 1, 2022; and for the 37.5 acre parcel, $67,789,500 as of January 1, 2020, and $70,305,000 as of January 1, 2021, and January 1, 2022. N.T., 11/17/21, at 5-6. In 2019, the smaller parcel was assessed at $4,586,112 and the larger parcel was assessed at $28,171,897. *See* Ex. M-21 at 3 (unpaginated). By contrast, in Tax Year 2020, only 6 out of the 23,591 single-family homes in the School District were assessed to be at least $1 million (or fewer than .03% of single-family homes). *See* Angelides Report at 7.

> The Uniformity Clause focuses on purposeful differential **treatment**, not differential **impact**. A neutral, systematic treatment of all properties might affect different properties differently due to their economic value, which varies as the economy and markets fluctuate. To violate the Uniformity Clause, the classification would have to be drawn in a way that indicates the members of one class will be treated differently regardless of such changes, which did not occur here.

*Id.* at 30-31 (emphasis in original).

Although I do not contend the "Uniformity Clause imports the concept of 'disparate impact' wholesale from civil rights law[,]" *id.* at 30, I disagree with the majority insofar as it suggests that differential impact is irrelevant or that the policy would have to be drawn to facially discriminate against members of a subclass in order for the Uniformity Clause to kick in. In my view, such a holding is irreconcilable with our holding in *Clifton*.

In that case, taxpayers challenged Allegheny County's base year method[14] for property valuation, where after a series of litigation, assessments for 2006 and subsequent years were to be based on properties' values from a 2002 base year. Although we held the base year method was not facially unconstitutional, we held its application in Allegheny County led to a lack of uniformity. *See Clifton*, 969 A.2d at 1221-22. In doing so, we explained that typically, a taxpayer bringing a uniformity challenge "must demonstrate that: (1) the enactment results in some form of classification; and (2) such classification is unreasonable and not rationally related to any legitimate state purpose." *Id.* at 1211. We also explained that "when a method or formula for computing a tax will, in its operation **or effect**, produce arbitrary, unjust, or unreasonably

---

[14] "Under a base year system of valuation, a county performs a countywide reassessment of all real property in the base year, and then uses each property's base year assessment as that property's basis for taxation in the base year, as well as its basis (*i.e.*, assessed value) in subsequent years. . . . In the base year, a property's assessed value may be 100% of its actual value, and thus, assessments of all real estate in the county are based on actual, fair market value for the base year. Each year thereafter, however, a given property's market value may change, but its assessment ordinarily remains static, fixed at its base year level until the next countywide reassessment." *Clifton*, 969 A.2d at 1203 (citations omitted).

discriminatory results, the uniformity requirement is violated." *Id.* (emphasis added). And as noted above, we clarified that property taxation is different because "real property **is** the classification[,]" meaning in property tax challenges, a court "often needs only to focus on the first prong of the uniformity analysis — whether the statute results in a 'classification' — because in the property taxation context, any disparity in tax liability, beyond the expected practical inequities, most likely constitutes a violation of the Uniformity Clause." *Id.* at 1212-13 (emphasis in original).

We held that the taxpayers failed to lodge a successful facial challenge, explaining a base year system might not implicate the Uniformity Clause "if, for example, a county conducted adequate periodic reassessments, or if it could be shown that property values in a particular county remained relatively unchanged, or those values had virtually the same rate of change." *Id.* at 1224. But based on the evidence presented at trial, we held that the indefinite base year assessment system used in Allegheny County "resulted in significant disparities in the ratio of assessed value to current actual value[.]" *Id.* at 1222. We observed "[t]he disparity is most often to the disadvantage of owners of properties in lower-value neighborhoods where property values often appreciate at a lower rate than in higher-value neighborhoods, if they appreciate at all." *Id.* We relied on "the proportionality principle, which forms the basis of the uniformity requirement, [and] requires that taxpayers pay no more or less than their proportionate share of the cost of government." *Id.* at 1224 ("To ensure proportionality, all property must be taxed uniformly, with the same ratio of assessed value to actual value applied throughout the taxing jurisdiction."). We explained the evidence showed property values in Allegheny County changed over time and at varying rates in different neighborhoods, so the frozen values applied under the base year method resulted in disparities. *See id.* at 1225.

In light of *Clifton*, I respectfully disagree with the majority's assertion "[t]he Uniformity Clause focuses on purposeful differential **treatment**, not differential **impact**." Majority Opinion at 30 (emphasis in original). Viewed through *Clifton*'s lens, although the initial **treatment** of property owners in Allegheny County was not differential when the county first established the 2002 base year (everyone was assessed at their 2002 fair market value), the base year method violated uniformity because it had a differential **impact** when property values changed at varying rates within the County and the base values stayed the same. Likewise, *Clifton* disproves the majority's assertion that "[a] neutral, systematic treatment of all properties might affect different properties differently due to their economic value, which varies as the economy and markets fluctuate[,]" but "[t]o violate the Uniformity Clause, the classification would have to be drawn in a way that indicates the members of one class will be treated differently regardless of such changes[.]" *Id.* at 30-31. "[S]uch changes" in economic values are exactly what caused the Uniformity Clause violation in *Clifton*, notwithstanding the facially neutral policy. *See also GM Berkshire*, 290 A.3d at 250 (Mundy, J., OISA) ("If pronounced inequalities become pervasive, relief compelling a countywide reassessment may be available."); *Mount Airy #1*, 154 A.3d at 277 (we may not "overlook the patently discriminatory effect of a particular tax merely because the General Assembly employed a formula that, at first blush, does not resemble a traditional variable-rate tax"); *Beattie v. Allegheny Cty.*, 907 A.2d 519, 523-24 (Pa. 2006) (in case about administrative exhaustion, affirming Commonwealth Court decision that if "a discriminatory effect [against lower value homes] exists from the systematic application of the [c]ounty's mass appraisal system, the adequacy of the statutory remedy provided to taxpayers must be evaluated, for if it is inadequate the trial court may be permitted to exercise its equity jurisdiction").

In my view, even if the School District's policy were facially neutral (it's not, because it differentiates between properties above and below the monetary threshold), it clearly has an unequal effect on non-residential properties. Specifically, as of 2019, only one residential property had been appealed under the School District's policy, which had been in effect since 2012. *See* Trial Court Opinion, 3/8/22, at 2. Moreover, of the sixteen properties appealed for the tax years at issue in this case, none were residential. *See* Ex. M-21 at 3 (unpaginated) (chart of final list of properties for appeal showing two were apartment complexes, two were industrial, eleven were commercial, and one was "Restaurants, Stores (retail)"). According to Taxpayers' expert, Dr. Angelides, single-family residences comprised 84.2% of all properties in the School District during Tax Year 2020 but 0% of the appeals, while commercial properties comprised only 2.9% of all properties in the School District but 75% of appeals, apartments comprised only 0.2% of all properties but 12.5% of appeals, and industrial properties comprised only 0.1% of all properties but 12.5% of appeals. *See* Angelides Report at 5 (Table 1).[15] Thus, it is patent from the record that although single-family homes comprise the vast majority of properties in the School District, they are being appealed at a strikingly low rate compared to non-residential properties.

But even if one does not believe Taxpayer built a sufficient record here to establish the School District's policy has a disparate effect on commercial and other non-residential property types, we should not foreclose the possibility a taxpayer could prove a disparate

---

[15] It appears Dr. Angelides counted the one property listed as "Restaurants, Stores (retail)" in the School District's final chart as a commercial property. I recognize the School District rebutted portions of Dr. Angelides's testimony that there were multiple residential properties that met the $10,000 threshold based on the fact he overlooked that certain properties were entitled to lower tax rates under the Clean and Green Program, *see* 72 P.S. §§5490.1-5490.13, but it does not appear the School District challenged that single family residences comprised the majority of properties in the district and that none were chosen for assessment appeal in 2019.

effect in other cases using methods similar to those employed in *Clifton,* analyzing, for example, the coefficient of dispersion and the price-related differential (which is an accepted indicator of inequity between high-value properties and low value properties). Certainly, as in *Clifton*, one could foresee how over time, the School District's policy could impact different neighborhoods differently, if values rise and fall at different rates within the district (which difference could be further exacerbated by the different millage rates among the different municipalities). Or, imagine if this policy continues for another decade, and still the School District appeals only a nominal amount of single-family residences. Unlike the majority, I would leave open the possibility that a differential impact, proven by such means, violates the Uniformity Clause.

## IV. Conclusion

For all of the above reasons, I respectfully dissent. Moreover, I take this opportunity to reiterate the point I first made in *GM Berkshire*: "The underlying inequity that arises by permitting clearly outdated, decades-old assessments to continue indefinitely for most properties in a district, while identifying the greatest outliers from those assessments to challenge, could be cured by more frequent county-wide assessments of all properties in each taxing district." 290 A.3d at 259-60 (Dougherty, J., OISR). This is an ongoing problem requiring a legislative fix. And although "I am cognizant of the political unpopularity frequent and costly county-wide property reassessments likely entail[,]" "the Uniformity Clause prohibits disparate treatment 'in order to avoid political accountability.'" *Id.*, *quoting Valley Forge*, 163 A.3d at 979.

Chief Justice Todd and Justice Donohue join this dissenting opinion.